[No. S024543. Feb. 28, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON MICHAEL BALCOM, Defendant and Appellant.

**COUNSEL**

David C. King, under appointment by the Supreme Court, for Defendant and Appellant.

Charles H. James, Public Defender (Contra Costa), Jack Funk, Deputy Public Defender, and John M. Sink as Amici Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield and Gary W. Schons, Assistant Attorneys General, Robert M. Foster, Keith I. Motley and Laura Whitcomb Halgren, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, J.**—In *People v. Ewoldt, ante*, page 380 [27 Cal.Rptr.2d 646, 867 P.2d 757], we overruled the holding in *People v. Tassell* (1984) 36 Cal.3d 77 [201 Cal.Rptr. 567, 679 P.2d 1] that evidence of uncharged misconduct is admissible to establish a common design or plan only if such evidence demonstrates a "single, continuing conception or plot" of which the charged crime is a part. (*People v. Ewoldt, supra, ante*, at p. 401.) We held instead in *Ewoldt* that such evidence is admissible to establish a common design or plan if the uncharged misconduct "shares sufficient common features with the charged offenses to support the inference that both the uncharged misconduct and the charged offenses are manifestations of a common design or plan." (*Id.* at p. 403.)

In the present case, we hold that evidence tending to establish that, soon after the commission of the charged offenses of rape and robbery, defendant committed a rape and robbery in Michigan in a manner quite similar to the charged offenses, was admissible to demonstrate the existence of a common design or plan which, in turn, was relevant to demonstrate that defendant either employed or developed that plan in committing the charged offenses.

### FACTUAL AND PROCEDURAL HISTORY

Defendant was charged by information with rape (Pen. Code, § 261, subd. (2)) and related offenses of burglary and robbery.[1] Following trial, the jury found defendant guilty of first degree robbery but was unable to reach a verdict on the rape and burglary counts. The case was set for retrial on the rape count only. Prior to the second trial, the trial court ruled that evidence could be admitted tending to establish that defendant had committed a rape and robbery in Michigan less than two months after the charged offense.

The victim in the present case, Denise B., testified that on July 24, 1988, she lived in a rented condominium she shared with her roommate, Jace O. At approximately 1 a.m., Denise was alone, dressed in a nightgown and robe, when she heard a knock on her front door. Looking out the peephole, she

---

[1]At the time of the alleged offense, section 261, subdivision (2), defined rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: . . . [¶] (2) Where it is accomplished against a person's will by means of force, violence, or fear of immediate and unlawful bodily injury on the person or another." (Stats. 1986, ch. 1299, § 1, p. 4592.) The statute subsequently was amended to redesignate this provision as section 261, subdivision (a)(2), and add, to the definition of rape, acts of intercourse accomplished by means of duress or menace.

observed in the dimly lit hallway a man wearing a cap. When she opened the door, the man, a six-foot-tall Caucasian, inquired whether a person named Mike resided there. Denise responded in the negative, and the man walked away as she closed the door.

Approximately five minutes later, there was another knock at the door. Denise looked out the peephole and again observed a man wearing a cap. Rather than open her door again, she went onto her patio, looked over the fence, and saw defendant, a six-foot-tall Black man, standing by her front door. Defendant, who was holding a rifle, ran toward her and leapt over the fence. Pointing the weapon at Denise, he ordered her into the condominium.

Denise sat on the couch and asked defendant what he wanted. Defendant responded, "Where's your money?," and she replied that it was inside her purse, which was in the bedroom. When defendant ordered her to retrieve it, she entered the bedroom. As she did so, defendant followed, put his arm around her, and fondled her breast. Denise gave defendant the small amount of money that was inside her purse. Defendant asked for "the card." Denise thought he meant her credit cards and began to retrieve them, but defendant stopped her, stating: "[N]o, no, the card for the machine." After Denise gave defendant her automated teller machine (ATM) card, he asked for her personal identification number (PIN) for the ATM card, threatening he would return and kill her in the event the number was incorrect. She gave him the correct number. At defendant's direction, Denise surrendered the key to her automobile and described the vehicle's appearance and location.

Defendant asked Denise for other valuables and looked through her belongings. Finding little of value, he said, "Well, since you don't have anything [it] looks like I'm going to have to rape you." Defendant tied Denise's wrists with a belt and ordered her to kneel on the floor. She hesitated, begging, "Please, please, don't," but defendant put the gun to her face and again ordered her onto the floor. When she complied, defendant gagged her with a bandanna and ordered her to lie on her back. He then ripped open her robe, raised her nightgown, removed her underpants, lowered his pants, and raped her. Defendant asked Denise whether it hurt or felt good, but she did not respond.

Defendant took Denise's watch and camera and an orange towel. He made her sit on the bed and tied her ankles with another belt. Telling her he was a member of a gang, he threatened that the gang would kill her if she reported him to the police. He then left. After managing to remove the gag, Denise telephoned the police.

About this time, a visitor to the condominium complex observed a man matching defendant's general description, wearing a cap, leave the vicinity of Denise's condominium carrying a long object covered with a gold-colored towel. From its shape and the manner in which it was being carried, the visitor believed the object was a rifle.

When the police arrived, they found the door to the condominium ajar and Denise inside, bound at the wrists and ankles. The condominium had been ransacked. Denise's automobile was missing.

Approximately six weeks after the commission of the crime, Denise was shown a photographic lineup, which did not include a photograph of defendant. She did not identify any of the photographs as that of her assailant. A few days later, she was shown a second photographic lineup, which did include a photograph of defendant. Denise identified defendant as her assailant.

The owner of a pawnshop testified that defendant pawned the victim's camera. An expert in fingerprint identification testified that defendant's fingerprints matched a fingerprint on the pawn slip, as well as one found on the bottom of a jewelry box which Denise kept in her bedroom. An analysis of a sample of defendant's blood was compared with an analysis of semen collected from the victim's vagina and revealed that defendant was included in the group of men who could have produced that semen. This group includes approximately 13 percent of the Black male population.

Defendant testified that he had met the victim and her roommate, Jace O., when he accompanied his friend to Denise's condominium, where the friend consummated a drug transaction with Jace. Defendant agreed to sell a gold necklace to Jace for $250 and left the necklace with him.

Defendant testified that when he returned to the condominium the following night to collect his money, Denise invited him in, stating that Jace would arrive shortly. Defendant claimed that he and Denise conversed and then engaged in consensual sexual intercourse.

Defendant further testified that Denise then told him that Jace was not returning and had no intention of paying him the $250. This upset defendant, and he demanded the money from Denise. When she refused, he demanded her ATM card. When she again refused, defendant removed the card from her purse, but she would not divulge her PIN. Defendant took her camera, placing it on the bed while he searched for other valuables. Denise grabbed the camera and threw it at defendant. Defendant then tied her wrists and

ankles with belts. When she threatened to "yell rape," defendant gagged her with a bandanna. After Denise finally provided defendant with her PIN, he took the ATM card, the camera, and the keys to her automobile, driving off in her vehicle. Defendant withdrew $200 from Denise's bank account and pawned the camera for $20.

In his testimony, defendant also admitted he had suffered a felony conviction for "criminal sexual assault" in Michigan, where his family resided at the time. Defendant stated he had been sentenced to a term of 50 years in prison for that offense and was appealing from the judgment.

In rebuttal, Theresa H. testified for the prosecution regarding the Michigan offense. On September 2, 1988, six weeks after the charged offense was committed, she was driving out of her apartment complex at 6:30 a.m. when defendant, who was wearing a cap, motioned for her to stop and asked for directions. As she was replying, defendant placed a handgun to her head, opened the door of the automobile, and, shoving her aside, entered the vehicle and began driving. Defendant assured her he wanted only money.

Defendant parked the automobile on a dirt road behind a business establishment. As Theresa reached for her purse, defendant "jumped on top" of her and said he was going to rape her. He tore off her clothes, pulled down his pants, and engaged in sexual intercourse with Theresa.

Thereafter, defendant went through Theresa's purse and took her ATM card from her wallet, asking whether he could obtain cash with it. Theresa asked whether he would let her go if she gave him her PIN and could prove it was valid. When defendant replied affirmatively, she gave him a "personal identification number sheet" from her purse. After defendant allowed Theresa to leave the vehicle, he drove away.

The jury in the present proceedings found defendant guilty of rape. After the Court of Appeal affirmed the resulting judgment of conviction, we granted defendant's petition for review.

### DISCUSSION

The People contend the evidence that defendant committed the Michigan rape and robbery several weeks after the commission of the alleged offenses was admissible to prove intent. We disagree, but conclude that the evidence was admissible to demonstrate the existence of a common design or plan which, in turn, was relevant to establish that defendant either employed or developed that plan in committing the charged offenses.

I

■ Pursuant to Evidence Code section 1101, evidence that the defendant in a criminal prosecution committed an uncharged offense may be admitted if relevant to prove some relevant fact other than the defendant's character—such as intent or identity, or that the defendant acted pursuant to a common design or plan. We first examine the People's contention that evidence of defendant's uncharged offenses was admissible to prove intent.

"Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' [Citation.]" (*People* v. *Ewoldt, supra, ante,* p. 394, fn. 2, italics in original.) In the present case, however, if the jury found that defendant committed the act alleged, there could be no reasonable dispute that he harbored the requisite criminal intent. (*Id.* at p. 406.)

The victim testified that defendant placed a gun to her head and forced her to engage in sexual intercourse. Defendant conceded that he engaged in sexual intercourse with the victim but denied that he used a gun or otherwise accomplished such intercourse against the victim's will, claiming she voluntarily consented.

These wholly divergent accounts create no middle ground from which the jury could conclude that defendant committed the proscribed act of engaging in sexual intercourse with the victim against her will by holding a gun to her head, but lacked criminal intent because, for example, he honestly and reasonably, but mistakenly, believed she voluntarily had consented. (*People* v. *Williams* (1992) 4 Cal.4th 354, 362 [14 Cal.Rptr.2d 441, 841 P.2d 961].) On the evidence presented, the primary issue for the jury to determine was whether defendant forced the complaining witness to engage in sexual intercourse by placing a gun to her head. No reasonable juror considering this evidence could have concluded that defendant committed the acts alleged by the complaining witness, but lacked the requisite intent to commit rape.

■ "Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' . . . 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.]" (*People* v. *Ewoldt, supra, ante,* p. 404, italics in original.)

■ Defendant's plea of not guilty put in issue all of the elements of the offenses, including his intent (*People* v. *Daniels* (1991) 52 Cal.3d 815,

857-858 [277 Cal.Rptr. 122, 802 P.2d 906]), and evidence that defendant committed uncharged similar offenses would have some relevance regarding defendant's intent in the present case. But, because the victim's testimony that defendant placed a gun to her head, if believed, constitutes compelling evidence of defendant's intent, evidence of defendant's uncharged similar offenses would be merely cumulative on this issue. (*People* v. *Ewoldt, supra, ante*, p. 405.) Accordingly, we conclude that the limited probative value of the evidence of uncharged offenses, to prove *intent*, is outweighed by the substantial prejudicial effect of such evidence.[2] We reach a different conclusion, however, concerning the admissibility of this evidence to prove the existence of a common design or plan.

## II

As we explained in *Ewoldt*, "[e]vidence of a common design or plan is admissible to establish that the defendant committed the *act* alleged. Unlike evidence used to prove intent, where the act is conceded or assumed, '[i]n proving design, the act is still undetermined . . . .' [Citation.]" (*People* v. *Ewoldt, supra, ante*, p. 394, fn. 2, italics in original.) To establish a common design or plan, the evidence must demonstrate not merely a similarity in the results, but " 'such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of

---

[2]In his concurring and dissenting opinion, Justice Baxter concludes that defendant's uncharged misconduct was admissible to prove, as an intermediate fact from which it can be inferred that defendant committed the charged offense, that defendant "intended" to rape the victim. This approach is unprecedented and raises many questions left unanswered by the concurring and dissenting opinion. The word "intent" has several meanings, including "the state of mind with which an act is done." (Webster's New Collegiate Dict. (9th ed. 1990) p. 629.) Prior cases interpreting Evidence Code section 1101 have used "intent" in this sense. (See, e.g., *People* v. *Ewoldt, supra, ante*, p. 394, fn. 2; *People* v. *Robbins* (1988) 45 Cal.3d 867, 879-880 [248 Cal.Rptr. 172, 755 P.2d 355].) The concurring and dissenting opinion, however, uses the term "intent" in a different way, considering whether defendant "intended" to rape the victim. (Conc. and dis. opn. of Baxter, J., *post*, p. 433.) "Intend" means "to have in mind as a purpose or goal: plan." (Webster's New Collegiate Dict., *supra*, p. 629.)

To the extent that the concurring and dissenting opinion concludes that evidence of defendant's uncharged misconduct was admissible because it demonstrates that defendant had a plan to commit the charged offenses, it simply restates the holding of the majority. But the statement in the concurring and dissenting opinion that such evidence is admissible "if the circumstances of the accused's criminal sexual misconduct on other occasions tend to establish that he harbored criminal sexual intent toward the current complainant" (conc. and dis. opn. of Baxter, J., *post*, p. 433) would establish an ill-defined standard that does not clearly exclude evidence of a defendant's criminal disposition, as required by Evidence Code section 1101, subdivision (a). For example, evidence that a defendant charged with rape had committed rape on another occasion in a manner different from the charged offense may tend to establish that the defendant had a propensity to commit rape and, therefore, "harbored criminal sexual intent toward the current complainant," but such evidence is inadmissible under Evidence Code section 1101 as mere evidence of criminal disposition. (*People* v. *Ewoldt, supra, ante*, p. 393.)

which they are the individual manifestations.' [Citation.]" (*Id.* at p. 393-394.)

In the present case, the uncharged offenses committed by defendant in Michigan share features in common with the charged offenses sufficient to support the inference that the uncharged acts and the charged offenses were manifestations of a common design. In both instances, which occurred only six weeks apart, defendant, wearing dark clothing and a cap, went to an apartment complex in the early morning, sought out a lone woman unknown to him, and gained control over her at gunpoint. In both instances, defendant initially professed only an intention to rob the victim, waiting until he had moved the victim to the location where the rape would occur before expressly announcing his intention to rape her, forcibly removing her clothing, and committing a single act of intercourse. In both instances, defendant stole the victim's ATM card, obtained her PIN, and escaped in the victim's automobile. These similarities support the inference that defendant committed the Michigan rape and robbery pursuant to a design or plan that he either employed or developed in committing the charged offenses.

To be relevant, the plan, as established by the similarities between the charged and uncharged offenses, need not be distinctive or unusual. Evidence that the defendant possessed a plan to commit the type of crime with which he or she is charged is relevant to prove the defendant employed that plan and committed the charged offense. "For example, evidence that a search of the residence of a person suspected of rape produced a written plan to invite the victim to his residence and, once alone, to force her to engage in sexual intercourse would be highly relevant even if the plan lacked originality. In the same manner, evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]" (*People* v. *Ewoldt, supra, ante,* p. 403.)

In this manner, the use of evidence of uncharged misconduct to demonstrate a common design or plan differs from the use of such evidence to prove *identity.* "Evidence of *identity* is admissible where it is conceded or assumed that the charged offense was committed by someone, in order to prove that the defendant was the perpetrator." (*People* v. *Ewoldt, supra, ante,* p. 394, fn. 2, italics in original.) In order for evidence of an uncharged

offense to be relevant for this purpose, it must share with the charged offense characteristics that are " 'so unusual and distinctive as to be like a signature.' [Citation.]" (*Id.* at p. 403.) The highly unusual and distinctive nature of both the charged and uncharged offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense.

■    Although an uncharged offense need not possess unusual or distinctive characteristics to be relevant to establish the existence of a *common design or plan*, the presence of unusual or distinctive shared characteristics may increase the probative value of such evidence for this purpose. For example, in *People* v. *Peete* (1946) 28 Cal.2d 306 [169 P.2d 924], the defendant was prosecuted for murdering her employer. The victim had been shot in the back of the neck, the bullet having struck the fourth cervical vertebra, narrowly missing the spinal cord, and her body was buried in the backyard of her home. (*Id.* at pp. 310-313.) Evidence was introduced establishing that the defendant previously had killed her landlord. There were many similarities between the charged offense and the earlier murder, but the most striking were that the victim had been shot in the back of the neck, the bullet having struck the fourth cervical vertebra and severed the spinal cord, and that his body was buried beneath his residence. (*Id.* at pp. 317-318.) These unusual and distinctive shared characteristics increased the probative value of this evidence in establishing that the defendant committed both offenses pursuant to a common design or plan.

■    The circumstance that the uncharged offense occurred *after* the charged offense does not lessen its relevance in demonstrating the existence of a common design or plan. In *People* v. *Coefield* (1951) 37 Cal.2d 865 [236 P.2d 570], this court held admissible, in a prosecution for murder committed during the course of a robbery, evidence that the defendant had participated in three uncharged similar offenses, two of which were committed prior to, and one of which was committed subsequent to, the charged offense. After determining that these uncharged offenses were sufficiently similar to the charged offense "to show that the [charged] robbery was part of a common scheme, design or plan to commit robberies," this court concluded: "Since the evidence was relevant on the question of common scheme and intent to rob, it was admissible whether the other offenses were prior or subsequent. [Citations.]" (*Id.* at p. 870; cf. *People* v. *Thompson* (1980) 27 Cal.3d 303, 312, 320-321 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Frank* (1865) 28 Cal. 507, 518.) One commentator has stated: "If evidence of an uncharged offense is relevant, there is no distinction between an offense that is *prior* to and one that is *subsequent* to the date of the charged offense." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 33.6, p. 1200, italics in original.)

Other jurisdictions have expressed the same rule. "It is well-established in [the federal second] circuit that evidence of *subsequent* similar acts, including other crimes, is admissible in the discretion of the trial court if 'it is

substantially relevant for a purpose other than merely to show defendant's criminal character or disposition', [citation], and its probative worth outweighs its potential prejudicial impact. [Citations.]" (*United States* v. *Cavallaro* (2d Cir. 1977) 553 F.2d 300, 305, italics added.) " 'Both prior conduct *and subsequent conduct* may be relevant . . . , depending on the circumstances and the probative value of the collateral conduct sought to be proven.' " (*People* v. *Tipton* (1980) 78 Ill.2d 477 [36 Ill.Dec. 687, 401 N.E.2d 528, 532], and cases cited, italics in original.)

In the present case, the similarities between the charged offenses and the later uncharged offenses support the inference that defendant either possessed the plan before the commission of the charged offenses and committed both the charged and uncharged offenses pursuant to that plan, or that defendant developed the plan during the commission of the charged offenses and then employed that plan in committing the uncharged offenses. In either event, evidence of defendant's common design or plan was relevant on the issue of his guilt or innocence of the charged offenses.

Consider the example of a defendant who is alleged to have taken money hidden in a freezer during the commission of the charged offense. Evidence that, during the commission of a subsequent crime, the defendant searched a freezer for valuables would be relevant to establish a common design or plan. The relevance of this evidence would be the same whether the defendant had formulated the plan to search freezers for valuables prior to the charged offense, or instead learned during the commission of the charged offense that some individuals hide valuables in their freezers, incorporating this knowledge into a plan that the defendant employed in committing the later, uncharged offense.

We conclude, therefore, that evidence of the Michigan incident shares sufficient common features with the charged offenses to support the inference that the uncharged acts and the charged offenses are manifestations of a common design or plan.

■ This conclusion, however, does not end our inquiry. As noted above, "[e]vidence that involves crimes other than those for which a defendant is being tried is admitted only with caution . . . ." (*People* v. *Thompson* (1988) 45 Cal.3d 86, 109 [246 Cal.Rptr. 245, 753 P.2d 37].) ■ Although we have concluded that evidence of defendant's uncharged criminal conduct is relevant to establish a common design or plan, in order to be admissible such evidence "must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. [Citations.]" (*Ibid.*) ■ We thus proceed to examine whether the probative value of

the evidence of defendant's uncharged offenses is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The probative value of this evidence stems from the similarity between the uncharged offenses and the charged offenses—a similarity which, as noted above, is sufficient to support the inference that defendant acted pursuant to a common design or plan. The close proximity in time of the uncharged offenses to the charged offenses increases the probative value of this evidence.

The probative value of the evidence of defendant's uncharged offenses also is increased because its source apparently was independent of the evidence of the charged offenses. The victim of the subsequent Michigan offenses apparently reported the manner in which defendant raped and robbed her at a time when she had no knowledge of the charged offenses. (Cf. *People* v. *Ewoldt, supra, ante,* p. 404.)

The probative value of this evidence is decreased, however, by the dissimilarities between the uncharged and the charged offenses. In the charged offenses, defendant allegedly forced entry into the victim's residence, committing the crimes at that location. In the uncharged offenses, defendant forced entry into the victim's automobile and, after driving to another location, committed the crimes inside the vehicle. Also, defendant used a rifle in the charged offenses and a handgun in the uncharged offenses.

As for the prejudicial impact of the evidence, the circumstance that the uncharged acts resulted in a criminal conviction and a substantial prison term decreases, in two ways, the potential for prejudice, undue consumption of time, or confusing the issues. (Evid. Code, § 352.) First, the jury was not tempted to convict defendant of the charged offenses, regardless of his guilt, in order to assure that he would be punished for the uncharged offenses, because the jury was aware he had been sentenced to a substantial prison term for the uncharged offenses. Second, the attention of the jury was not diverted to a determination whether or not defendant had committed the uncharged offenses, because that fact had been determined conclusively by the resulting Michigan conviction. (*People* v. *Ewoldt, supra, ante,* pp. 405-406.)

In light of these factors, we conclude the probative value of the evidence of defendant's uncharged offenses, in establishing the existence of a common design or plan, outweighed its prejudicial effect. Accordingly, the trial court did not err in admitting this evidence.

Disposition

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Kennard, J., Arabian, J., and Panelli, J.,* concurred.

**ARABIAN, J.**—I concur. The majority opinion fully justifies admitting evidence of the Michigan crime. I write separately to state an additional reason the evidence was admissible. It corroborated the complaining witness's testimony in this case.

Sex crimes, more than others, tend to be committed in private. Usually, the only witnesses are the complaining witness and the accused. Often the victim testifies the defendant raped her, and the defendant testifies she is lying. Often, there is no physical evidence, especially when, as here, the defendant admits the intercourse but claims consent. In that situation, who should be believed? This can present difficult credibility questions for the jury, especially if there is no evidence corroborating either version. It is therefore particularly important that when corroborating evidence *does* exist, the jury be allowed to consider it. In making the momentous decision of guilt or innocence of rape, the jury needs all the evidence available; it should not be handicapped by withholding probative evidence supporting one party or the other.

Evidence that defendant committed rape under somewhat similar circumstances in Michigan a short time after the disputed events of this case strongly supports the inference that the victim's testimony is the truthful one, not defendant's. It might be coincidence that the complaining witness in this case and the victim in Michigan both claimed defendant raped them, and that both accounts contain common details. But that is unlikely. If a person claims the defendant committed rape, and the defendant denies it, the complaining witness might be lying. If, however, two people claim rape, and if their stories are sufficiently similar, the chance that *both* are lying, or that one is truthful and the other invented a false story that just happens to be similar, is greatly diminished. The jury can reasonably, and quite properly, infer that it is more likely both are truthful.

The more similar, and the more independent, the two accounts are, the greater the strength of the corroboration. The corroboration is most compelling when two persons who did not know each other, and could not have heard each other's story, independently tell of a distinctive, unusual method

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

of operation. If, for example, each victim independently stated that the defendant taunted them after the crime, gave them a quarter, and dared them to use it to call the police, the chance that each invented the same story would be almost nonexistent. The jury should be allowed to consider such highly relevant evidence.

When there are multiple similar accounts of rape, each is more likely to be true. Each mutually corroborates the other. This is a matter of logic, not prejudice. Evidence of the Michigan crime here does not merely show defendant is a bad person, or that he has a propensity to commit crimes; rather, it helps the jury decide who is telling the truth and to determine the facts. It tends in reason to show that defendant did in fact commit rape *in this case*.

The doctrine of corroboration is discussed at length in *People* v. *Thomas* (1978) 20 Cal.3d 457, 468-470 [143 Cal.Rptr. 215, 573 P.2d 433] (*Thomas*). There, we cited Court of Appeal cases that "suggest that evidence of prior sex offenses involving victims other than the prosecuting witness is generally admissible for the purpose of corroborating such witnesses without regard to the remoteness of the prior offenses or the lack of close similarity to the charged offense." (*Id.* at p. 468.) We found that the rule stated in those cases "is too broad and must, *to that extent*, be disapproved." (*Ibid.*, italics added.) But then, as stated in *People* v. *Pendleton* (1979) 25 Cal.3d 371, 378 [158 Cal.Rptr. 343, 599 P.2d 649], we "reaffirmed" the doctrine when correctly applied.

We stated in *Thomas* that *People* v. *Covert* (1967) 249 Cal.App.2d 81 [57 Cal.Rptr. 220] "properly recognized that by reason of the unique circumstances of privacy and seclusion surrounding the commission of most sex offenses the determination of witness credibility plays a central role. *Covert* thereby found justification for the admission of evidence of defendant's other sex offenses as corroborative of the prosecuting witness' version of the event. We *confirm*, to an extent at least, the propriety of the *Covert* thesis, namely, *that evidence of similar, nonremote offenses involving similar victims*, declared admissible in [*People* v. *Kelley* (1967) 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947] and *People* v. *Cramer* (1967) 67 Cal.2d 126 (60 Cal.Rptr. 230, 429 P.2d 582)] to show a common design or plan, *may also assist in corroborating the prosecuting witness' version of events*. Yet, we sense an inherent danger. Were the theory to be held applicable in *all* sex offense cases, without regard either to remoteness or similarity, the 'corroboration' exception would absorb the general rule of exclusion in its entirety, permitting introduction of all prior sex offenses for purposes of corroborating the prosecuting witness." (*Thomas, supra*, 20 Cal.3d at pp. 468-469, all but the final italics added.)

Because of these concerns, *Thomas* stated that "the remoteness and similarity restrictions expressed in *Kelley* and *Cramer* have particular application." (*Thomas, supra,* 20 Cal.3d at p. 469.) We disapproved other cases that applied the corroboration doctrine, but only to the extent those cases conflict with the "principles" stated in *Thomas.* (*Id.* at pp. 469-470.) By citing *People v. Kelley* (1967) 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947] and *People v. Cramer* (1967) 67 Cal.2d 126 [60 Cal.Rptr. 230, 429 P.2d 582], the *Thomas* court indicated that the degree of similarity needed for purposes of corroboration is like that for evidence showing a common design or plan. (See *People v. Ewoldt, ante,* 380 at pp. 395-396 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

The doctrine of corroboration is closely akin to another rationale for admitting other crimes evidence that we have recognized recently—the doctrine of chances. In *People v. Robbins* (1988) 45 Cal.3d 867, 879-880 [248 Cal.Rptr. 172, 755 P.2d 355], we quoted Wigmore's explanation of the doctrine: " 'the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them.' "

This explanation applies here. When one person claims rape, the unusual and abnormal element of lying by the complaining witness may be present. But when two (or more) persons tell similar stories, the chances are reduced that both are lying or that one is telling the truth and the other is coincidentally telling a similar false story.

In *People v. Tassell* (1984) 36 Cal.3d 77, 84 [201 Cal.Rptr. 567, 679 P.2d 1], we dismissed the doctrine of corroboration by peremptorily stating that it was "laid to rest in *People v. Thomas, supra.*" We did not, however, lay the doctrine to rest in *Thomas, supra,* 20 Cal.3d 457; we merely explained it and limited its application to its proper realm. Justice Mosk argues that principles of stare decisis prevent us from overruling *Tassell.* (*People v. Ewoldt, supra, ante* at p. 408 (dis. opn. of Mosk, J.).) As the majority correctly notes (*id.* at p. 401, fn. 5), *Tassell* itself violated stare decisis by ignoring or tacitly overruling prior settled authority. (See, e.g., *People v. Alcala* (1984) 36 Cal.3d 604, 634, fn. 18 [205 Cal.Rptr. 775, 685 P.2d 1126] [*Tassell* "effectively overruled" *Thomas* and *People v. Kelley, supra,* 66 Cal.2d 232].)

*Tassell* is the aberration, not the preceding line of authority that this court reaffirms today.

I thus agree with *Thomas* both in its affirmation of the doctrine of corroboration and in its expression of caution. Thus, evidence of other crimes that meets the similarity requirement for evidence of a common design or plan is also admissible under Evidence Code section 1101 to corroborate the complaining witness. As the majority opinion explains, however, such evidence, even if it meets the threshold requirements for admission, is subject to the trial court's discretion to exclude evidence under Evidence Code section 352 if its probative value is substantially outweighed by its prejudicial effect. (Maj. opn., *ante*, at pp. 426-427.)

Trial courts should decide on a case-by-case basis whether to exclude as unduly prejudicial other crimes evidence that is otherwise admissible to corroborate the complaining witness. The court should weigh the probative value against the prejudicial effect. To do so, it should consider such factors as the degree of similarity, the remoteness of the other crime, the independence of the complaining witness from the victim of the other crime, whether the other crime is particularly inflammatory relative to the instant crime, and whether defendant has been convicted of the other crime.

Favoring admission is any factor increasing the probative value. The more similar and less remote the incidents, the more probative the evidence. Additionally, the more independent the victims, the less likely they influenced each other, and the greater the tendency of each to corroborate the other. For example, if two victims who never heard of each other each accuse the same person of raping them, and if each account contains some bizarre or otherwise unique element, the evidence would be extremely probative. Another factor supporting admission would be a conviction for the other crime. (Maj. opn., *ante*, at p. 427.)

Favoring exclusion is any factor reducing the probative value. The less similar and more remote the incidents, and the less independent the witnesses, the less probative the evidence. The court must also weigh the prejudice. *Any* evidence of other crimes contains some potential undue prejudice. (*People* v. *Ewoldt, supra, ante,* pp. 403-404.) When the other crime is particularly inflammatory relative to the instant crime, the prejudice may be greater. Additionally, when the other crime has not resulted in a conviction, that factor weighs against admission, although that would be but one of the factors to consider, and does not itself disqualify the evidence from admission.

Here, as the majority correctly finds, the court acted well within its discretion in admitting evidence of the Michigan crime. Defendant had been

convicted of the crime, and its facts do not appear to be particularly inflammatory compared to those of this case. It is not remote, and the two victims, thousands of miles apart, were apparently completely unaware of each other when they reported the crimes.

As the majority explains, the two victims' accounts also contain significant similarities. Not knowing what was to happen in Michigan, the victim in this case accused defendant of doing what he later did in Michigan, that is, stealing the victim's automated teller machine card and forcing her to reveal her personal identification number during the incident in which he raped her. The doctrine of chances shows that it is less likely the victim here is lying than it would be without the Michigan evidence. Evidence of the Michigan crime enhances the credibility of the victim here.

For these reasons, in addition to the reasons stated in the majority opinion, evidence of the Michigan crime was properly admitted.

**BAXTER, J.,** Concurring and Dissenting.—I agree that evidence of defendant's uncharged Michigan offense was properly admitted under either the common plan theory advanced by the majority or the corroboration theory urged by Justice Arabian. However, the majority reject the Court of Appeal's rationale for admission of the uncharged offense, i.e., that it was relevant to show defendant's intent. (Maj. opn., *ante*, p. 422.) On this point, I part company with the majority. They fail to persuade me that the divergent accounts given by defendant and the complaining witness made evidence of defendant's criminal intent irrelevant for any purpose.

I agree that once the fact finder credited either Denise B.'s claim of forcible rape at gunpoint, or defendant's claim of intercourse with the complainant's actual consent, there could be no further legitimate dispute about defendant's criminal intent. I also accept that because rape is a general intent crime (*People v. Hernandez* (1988) 46 Cal.3d 194, 199, 209 [249 Cal.Rptr. 850, 757 P.2d 1013]; *People v. Thornton* (1974) 11 Cal.3d 738, 765-766 [114 Cal.Rptr. 467, 523 P.2d 267]), the prosecution need only prove wilful commission of the proscribed *conduct* (intercourse accomplished against the victim's will by specified means [Pen. Code, § 261]), and defendant's *subjective state of mind* is not itself a fact which must be independently resolved unless there is some evidence permitting the inference that he entertained a reasonable though mistaken belief in consent (*People v. Williams* (1992) 4 Cal.4th 354, 360-361 [14 Cal.Rptr.2d 441, 841 P.2d 961]; *People v. Mayberry* (1975) 15 Cal.3d 143, 153-156 [125 Cal.Rptr. 745, 542 P.2d 1337]). However, contrary to the reasoning advanced both by the instant majority and by the majority in *People v. Tassell* (1984) 36 Cal.3d

77, 88, footnote 7 [201 Cal.Rptr. 567, 679 P.2d 1], those principles do not mean that proof of intent is immaterial unless there is evidence of reasonable mistake.

Whenever, as here, the accused concedes he had intercourse with the victim on the charged occasion, evidence that he did so with intent to commit rape is obvious, logical, and proper circumstantial evidence that he actually engaged in that proscribed conduct. Indeed, evidence of his criminal intent may be particularly relevant as evidence of his actual conduct when the only two witnesses—he and the complainant—provide sharply contrasting versions of the sexual encounter.

For example, and by analogy to the majority's reasoning in a companion case (*People* v. *Ewoldt, ante,* 380, pp. 393-394 [27 Cal.Rptr.2d 646, 867 P.2d 757]), if defendant had written a letter stating he intended to rape Denise B., or any suitable victim he encountered, we would admit that letter to prove that when having intercourse with Denise B., he acted against her will by unlawful means. We would not exclude the intent evidence as immaterial simply because rape is a general intent crime. Nor would we assume that the witnesses' divergent accounts, each of which established defendant's state of mind if credited, had removed the "issue" of intent from the case.

It follows that if the circumstances of the accused's criminal sexual misconduct on other occasions tend to establish that he harbored criminal sexual intent toward the current complainant, and that he therefore acted in conformity with that intent, such other misconduct is material as "an intermediate fact 'from which [the ultimate fact actually in dispute] may [logically and naturally] be presumed or inferred.' . . ." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883], fn. & citation omitted.)[1]

What limits do Evidence Code sections 1101 and 352[2] impose upon the use of uncharged crimes for this purpose? Section 1101, subdivision (b) makes specific reference to both "intent" and "plan" as exceptions to the general rule against use of other crimes to prove charged offenses. Contrary

---

[1]Other crimes cannot be admitted unless relevant to an "ultimate fact" which is " 'actually in dispute' " (27 Cal.3d at p. 315), but, as *Thompson* makes clear, the fact proved by the other crimes need not itself be the ultimate fact; it may be merely an "intermediate fact" which forms a link in the chain of inferences leading to the ultimate fact. (*Id.,* at pp. 315-317.) Thus, even if intent is not an express element of the criminal charge at issue, other crimes may still be admissible to prove intent as an intermediate fact from which criminal conduct, the ultimate fact in dispute, may be inferred. By failing to address this principle, some cases have unduly circumscribed the concept of intent as a basis for the admission of other criminal conduct.

[2]All further statutory references are to the Evidence Code.

to the majority's suggestion, nothing in the statute implies that intent is a fact provable by other crimes only when it is an element of the charged offense. Indeed, the use of other crimes to establish an intermediate inference of "intent" is closely related to the use of such crimes to establish an intermediate inference of "common plan, scheme, or design." In each instance, the valid purpose of the evidence is to show that on the occasion of the charged offense, the accused harbored a particular criminal state of mind, and that he acted accordingly.

The particular circumstances of defendant's Michigan offense appear highly relevant to his intent against Denise B., apart from his mere propensity to commit rape. Theresa H., the Michigan victim, testified that defendant, a stranger, hijacked her car early one morning and announced his intent to rob her. He then drove her to a secluded location, "jumped on top" of her, said he was going to rape her, and began intercourse.

This unrebutted evidence shows more than the minimal elements of a rape upon Theresa H. It establishes with stark clarity that defendant had the actual, subjective, and specific purpose to proceed by criminal means—i.e., to accomplish the intercourse against Theresa's will, and by means of force or fear.

Moreover, as both the majority and Justice Arabian explain, the forcible armed rape committed by defendant against Theresa H. included features markedly similar to the circumstances surrounding the charged offense. The two incidents were only six weeks apart. This repetitive similarity creates a strong inference that defendant's intercourse with Denise B., like his intercourse with Theresa H., was undertaken with a criminal purpose to rape, and that he therefore did accomplish his intercourse with Denise, as with Theresa, against her will by means of force or fear. For this reason, I have no difficulty in concluding that neither section 1101 nor section 352 barred use of the Michigan rape to show defendant's similar intent against Denise B. as intermediate evidence that he raped Denise B.

Since enacted as a codification of existing law (see Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1101, p. 10), subdivision (b) of section 1101 has made clear that this statute is no bar to the admission of other acts committed by the accused insofar as they are relevant to prove *any* material fact in issue besides "his or her [mere] disposition to commit such an act." The absolute prohibition imposed by section 1101 itself is thus quite narrow, and the variety of situations in which questions of admissibility might arise is infinite. It may occasionally be clear as a matter of law that section 1101 is an absolute bar to the admission of

particular other-crimes evidence (see *Thompson, supra*, 27 Cal.3d at p. 317), but such easy solutions will be the exception, not the rule.

This makes it difficult to resolve other-crimes issues through the application of arbitrary rules purporting to interpret section 1101. Instead, the task of evaluating whether such evidence is being offered solely for a prohibited purpose, or is otherwise more prejudicial than probative, should proceed case by case. The responsibility should fall primarily upon trial judges exercising their careful discretion under section 352. Section 352, not section 1101, should provide the principal practical balance between the respective rights and interests of the accused and the People. Appellate review should afford the appropriate degree of deference to the trial court's balancing efforts.

For reasons already stated, I believe defendant's Michigan offense was not mere propensity evidence, but was relevant to common plan, corroboration, and intent, from which his commission of the charged conduct could be inferred. Accordingly, section 1101 was no absolute bar to admission of this evidence. Moreover, the majority correctly conclude that the trial court did not abuse its discretion by admitting the evidence under section 352. I therefore concur in the judgment.

**MOSK, J.**—I dissent for the reasons stated in my dissenting opinion in *People* v. *Ewoldt, ante*, 380, at page 408 [27 Cal.Rptr.2d 646, 867 P.2d 757] (dis. opn. of Mosk, J.). We should adhere to the rule established in *People* v. *Tassell* (1984) 36 Cal.3d 77 [201 Cal.Rptr. 567, 679 P.2d 1], and clarified by the Legislature in 1986. Evidence of uncharged crimes is admissible under Evidence Code section 1101 in a criminal prosecution to show a common scheme or plan only when such a plan is relevant to some ultimate issue in dispute—some issue other than the defendant's propensity to commit such crimes.

Here, as the majority establish, intent was not at issue. Identity was not in dispute. The contention that defendant raped and robbed a woman in Michigan *after* the charged crimes here is asserted to be relevant to establish a common scheme or plan, which in turn is said to be relevant to prove that defendant did commit the charged crime in accordance with the plan.

The majority explain that because defendant allegedly had a plan to commit a certain type of crime in another state on a *later* occasion, it can be inferred that he actually committed a crime of that type on an earlier occasion: "Evidence that the defendant possessed a plan to commit the type of crime with which he or she is charged is relevant to prove the defendant employed that plan and committed the charged offense." (Maj. opn., *ante*, p. 424.)

The difficulty with this assertion is that the evidence is held relevant not to establish any plan, but to demonstrate the *type* of crime defendant allegedly preferred to commit. Plan evidence is relevant to show that defendant committed the charged crime only if both crimes are part of the same plan. Thus, for example, in a crime reported recently, a criminal offender sent five letter bombs to members of a family in New York, killing various family members. Evidence of the commission of one of the crimes would be probative to show the commission of a charged crime because they were all part of the same plan.

Here, however, the two crimes do not appear to be part of a grand plan—nor do they appear markedly similar, as the majority concede. The majority would permit the evidence to be used, instead, to show that defendant is the type of evil person who tends to commit a particular kind of crime, and therefore, he must have actually committed the charged crime. This appears to be nothing but criminal propensity evidence.

I would reverse the judgment of the Court of Appeal.