Filed 8/23/21  P. v. Romero CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID ROMERO,<br><br>    Defendant and Appellant. | 2d Crim. No. B298960<br>(Super. Ct. No. 2013020258)<br>(Ventura County) |

David Romero appeals from the judgment after a jury convicted him of one count of forcible rape (Pen. Code, § 261, subd. (a)(2); count 1) and three counts of domestic violence (Pen. Code, § 273.5, subd. (a); counts 2-4), and found true an allegation that he kidnapped his victim to facilitate the rape (Pen. Code, § 667.61, subds. (a), (c)(1), & (d)(2)).  Romero admitted that he had suffered a prior strike conviction (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and prior serious felony conviction (Pen. Code, § 667, subd. (a)).  The trial court sentenced him to 50 years to life in state prison.

Romero contends the trial court erred when it: (1) admitted evidence of his prior acts of domestic violence and sexual assaults, (2) denied his motion to strike his prior strike conviction, and (3) imposed two-year sentences on counts 3 and 4. We affirm.

FACTUAL AND PROCEDURAL HISTORY

*Romero assaults and rapes B.*

Romero and B. began dating in early 2013. On June 21, Romero sent B. a series of text messages accusing her of cheating on him. She denied the accusations, and told Romero that she wanted to end their relationship.

Around 4:00 a.m. the next morning, B. awoke to a tapping sound on her window. She opened the curtains and saw Romero standing outside. He was agitated and asked who was in the room with her. B. said that no one was there and let Romero see inside.

Romero asked for B.'s phone. She showed it to him through the window but refused to give it to him. Romero then pushed in the screen, pulled B.'s arm through the window, and took the phone. He bruised B.'s arms in the process.

Romero climbed through the window and onto B.'s bed. He again asked who she was cheating on him with. B. reassured Romero that she was not cheating on him and told him to leave.

B. was scared and opened the bedroom door so she could wake her aunt and uncle. Romero grabbed B.'s arm and closed the door. He pinned her to the bed and took her car keys.

Romero forced B. out of the house and into her car. When she tried to get away he punched her in the face. He locked the car doors and drove away.

2

Romero drove to a park and stopped the car. He told B. they should get into the back seat and have sex. When she refused, he grabbed her neck and slapped her in the face. They then left the park.

Romero drove to a residential neighborhood, where he parked the car and got into the back seat. He again said that he wanted to have sex. When B. refused, Romero said that she had already "fucked somebody else so [she] could do it again." He pinned her down and raped her.

Romero told B. to say that she was a "slut" and wanted to have sex with him. He yanked her hair back when she refused. B. cried and asked Romero to take her home. He drove by her house but then made a U-turn. B. pleaded with Romero to let her out of the car. He instead hit her in the mouth, knocking several teeth loose.

Around 11:00 a.m., Romero took B. to the hospital. He told a nurse there that B. had hit her face on the dashboard of the car. He then ran away.

An examination revealed that several of B.'s teeth had been dislodged. Her mouth was swollen. She had a knot on the side of her face, damaged blood vessels in her eye, and bruises on her hand, wrist, and arms. There were fingerprint marks on her neck. B. told the nurse that Romero had caused her injuries.

*Pretrial proceedings*

Prosecutors charged Romero with one count of forcible rape and three counts of domestic violence. They alleged that he kidnapped B. to facilitate the rape and that he had suffered a prior strike conviction and prior serious felony conviction. Romero pled not guilty to the charges and denied the allegations.

3

In a pretrial motion, Romero sought to bar prosecutors from introducing evidence of prior sexual assaults and acts of domestic violence committed against M. Prosecutors argued the evidence was admissible pursuant to Evidence Code[1] sections 1108 and 1109 because both M. and B. had been trapped in moving vehicles with Romero and he had threatened and raped each of them.

M. testified at a pretrial hearing that she met Romero when she was 14 or 15 years old. They dated for about five years. Once, Romero picked her up to go to the movies. When she asked why he was driving in the wrong direction, Romero hit her. He later pushed her against a vehicle when she tried to retrieve her cell phone.

Another time Romero accused M. of flirting with a friend. M. told him he could find his own ride home and got into her car. Romero reached through the car window and choked M. He then got into the car and hit her. He later grabbed the steering wheel while she was driving, causing the car to careen off a bridge. It was totaled.

In another incident, M. exited an office at her college and saw Romero standing outside. He told her that he would punch her if she did not let him walk her to class. M. asked him to leave her alone. When she walked toward the campus police station, Romero told her that he would "fuck [her] up" if she went inside.

On another occasion, Romero went to M.'s house and told her that he had her school identification. M. let him inside, and said that she no longer wanted to date him. He pushed M. into her bedroom and raped her.

---

[1] Unlabeled statutory references are to the Evidence Code.

4

Romero showed up at M.'s college on another occasion. This time he followed her to her car and took her keys. He then demanded her cell phone so he could see if she had been talking to anyone else. M. gave him the phone so she could get her car keys back. When M. got in the car, Romero got into the back seat. M. said that she was driving to the campus police station. Romero grabbed the steering wheel and pointed it away from the station, toward his house. He hit her when she waved to a friend.

M. drove to Romero's apartment. He told her that if she went inside she would only have to stay for 15 minutes and they would not have sex. Once inside, Romero started kissing M. She wanted to leave. Romero told her that he was going to rape her again if she did not have sex with him. He then hit her several times.

The trial court found that evidence of these incidents was admissible at trial, and denied Romero's motion to exclude them.

*Trial proceedings*

M. testified at Romero's trial. Her trial testimony was consistent with her testimony at the pretrial hearing.

Romero testified in his own defense. He denied that he raped M., but admitted that he pled guilty to threatening and stalking her.

Romero said that he met B. in early 2013. The two were "attached" and wanted a future together. They had sex in the car "all the time."

On June 21, 2013, Romero and B. talked throughout the day. They expected to see each other around 2:00 a.m. the next morning. Romero went to B.'s house in the middle of the

5

night and tapped on her window. He broke the screen on the window because he was drunk. B. voluntarily let him inside. He did not grab her arm or strike her. He did push her so he could take her keys, however.

Romero and B. left her house to go to Port Hueneme. He had to force her into the car, and she tried to get out twice. Romero forced her back into the car each time but did not punch her.

Romero drove to Port Hueneme so they could watch the surf. They then went to a park so they could "hook up." They eventually drove to a residential neighborhood where they had consensual sex in the car.

Afterward, Romero and B. argued about text messages as they drove to his house. When Romero grabbed B.'s wrists, she slapped him. He then grabbed her by the neck and choked her. She kept slapping him, and he hit her in the face and head. She was spitting blood.

Romero drove B. to the hospital. He told a nurse that B. had hit her mouth on the dashboard. He ran away because he did not want to get arrested.

The jury found Romero guilty of all charges, and found the kidnapping allegation true. In a bifurcated proceeding, Romero admitted that he had suffered a prior strike conviction and prior serious felony conviction.

*Sentencing*

Prior to sentencing, Romero moved to strike his prior strike conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). He argued the trial court should grant his motion "to really just give him a chance at some hope in the future" given his relatively young age.

6

B. testified at the hearing on the *Romero* motion. She said that Romero tried to contact her after his arrest "in an attempt to sway [her] testimony, to get [her] to work with his defense attorneys and not to comply with" prosecutors. She still considered him a threat.

The trial court found that striking Romero's prior strike would not be in the interests of justice. Romero was arrested in this case after he "did something similar" previously. His youthfulness when he committed his crimes did not excuse his behavior.

After denying the *Romero* motion, the trial court struck the prior serious felony enhancement and sentenced Romero to 50 years to life in prison on his forcible rape conviction (25 years to life, doubled due to the prior strike). The court also imposed and stayed a consecutive eight-year term on Romero's domestic violence convictions: four years on count 2 (the low term of two years, doubled), and a consecutive two years each on counts 3 and 4 (one-third the middle term of three years, doubled).

## DISCUSSION

*Evidence of prior sexual assaults and acts of domestic violence*

Romero first contends the trial court erred when it admitted evidence of his prior sexual assaults and acts of domestic violence against M. because those incidents were "so numerous and so inflammatory that they outweighed any probative value of [his] guilt and overwhelmed the jury's ability to fairly determine guilt as to the charged offenses involving B."[2] We disagree.

_____

[2] Romero also argues the trial court erroneously admitted the evidence because it did not consider that "recent law and

7

In general, evidence of a defendant's uncharged misconduct is inadmissible to prove their predisposition to commit such conduct. (§ 1101, subd. (a).) Section 1108 sets forth an exception to this general rule, allowing evidence of uncharged sexual offenses to be admitted to prove the defendant's propensity to commit a charged sexual offense. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1164.) Section 1109 provides another exception, permitting evidence of uncharged acts of domestic violence to be admitted to prove the defendant's propensity to commit a charged act of domestic violence. (*People v. Fruits* (2016) 247 Cal.App.4th 188, 202.) Both exceptions are subject to the limitations of section 352, which precludes the admission of unduly prejudicial evidence. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233 [section 1109]; *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274 [section 1108].) We review the trial court's admission of evidence pursuant to these sections for abuse of discretion. (*People v. Story* (2009) 45 Cal.4th 1282, 1295 [section 1108]; *Brown*, at p. 1233 [sections 352 and 1109].)

There was no abuse of discretion here. A trial court must "engage in a careful weighing process under section 352" before admitting evidence of a defendant's uncharged offenses pursuant to sections 1108 and 1109. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) This includes considering factors

---

science recognize reduced culpability in juveniles and young adults under 25," which would have informed its analysis regarding whether the incidents involving M. were too remote in time to be presented by the jury. But Romero did not raise this argument in the proceedings below. It is forfeited. (*People v. Partida* (2005) 37 Cal.4th 428, 435 [party cannot argue on appeal that trial court "erred in failing to conduct an analysis it was not asked to conduct"].)

such as the uncharged act's "nature, relevance, and possible remoteness[;] the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry[;] its similarity to the charged offense[;] its likely prejudicial impact on the jurors[;] the burden on the defendant in defending against the uncharged offense[;] and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other . . . offenses, or excluding irrelevant though inflammatory details surrounding [them]. [Citations.]" (*Ibid.*)

The court below properly considered these factors when it admitted evidence of Romero's acts against M. The offenses Romero committed against M. were similar to those he committed against B., rendering them highly probative. (*People v. Balcom* (1994) 7 Cal.4th 414, 427.) In both cases, Romero's victims were women with whom he had dating relationships. He was jealous and paranoid and accused each of them of having relationships with other men. He stalked them, showing up unexpectedly at their schools, jobs, and homes. He exploited their vulnerabilities, assaulting them when they were alone in vehicles or taking their cell phones so they could not call for help. His abuse escalated over time, culminating in the rape of each victim. (See, e.g., *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1192-1193 [evidence sufficiently similar where defendant hit victims in moving cars, took their cell phones, and tried to prevent their escape]; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120 [evidence sufficiently similar where defendant stalked different girlfriends].)

Admitting the evidence of Romero's offenses against M. was not unduly prejudicial. The similarity of those offenses to

9

those committed against B. decreased their inflammatory nature. (*Falsetta, supra,* 21 Cal.4th at p. 924; *People v. Branch* (2001) 91 Cal.App.4th 274, 283-284.) There was little disparity in the strength of the evidence: Romero admitted to many of his assaults against both victims when he testified, including that he had been convicted of stalking and threatening M. That minimized the risk that jurors would be tempted to punish him for his prior offenses when deciding whether he committed those against B. (*Falsetta, supra,* 21 Cal.4th at p. 917; see also *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) Additionally, evidence of the offenses against M. and those against B. "each came from independent sources," minimizing any risk of distraction or confusion. (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1106; see also *Ewoldt,* at pp. 404-405 [where evidence of prior and current offenses comes from sources unaware of the other, probative value of evidence enhanced].) So, too, did the jury instructions on reasonable doubt (CALCRIM No. 220) and the use of evidence of uncharged offenses (CALCRIM Nos. 852B & 1191A). (*People v. Mullens* (2004) 119 Cal.App.4th 648, 661; *People v. Frazier* (2001) 89 Cal.App.4th 30, 42.) There was thus no abuse of discretion when the trial court admitted evidence of Romero's offenses against M.

*Prior strike conviction*

Romero next contends the trial court erred when it denied his motion to strike his prior strike conviction. There was no error.

"'The Three Strikes initiative . . . was intended to restrict courts' discretion in sentencing repeat offenders.' [Citation.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*), alterations omitted.) "To achieve this end, 'the Three

Strikes law does not offer a discretionary sentencing choice . . . but [instead] establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "concludes that an exception to the scheme should be made because . . . [the] defendant should be treated as though [they] actually fell outside the Three Strikes scheme.'" [Citation.]" (*Ibid.*, alterations omitted.) To find such an exception, a court must consider the "nature and circumstances of [the] present felon[y] and prior serious and/or violent felony convictions" and "the particulars of [the defendant's] background, character, and prospects." (*Ibid.*)

We review a trial court's denial of a *Romero* motion for abuse of discretion. (*Carmony*, *supra*, 33 Cal.4th at p. 374.) We will find such an abuse only "in limited circumstances": e.g., if the court "considered impermissible factors" in denying the motion. (*Id.* at p. 378.) But it is "'not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations." (*Ibid.*) So long as the "'record demonstrates that the . . . court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we [will] affirm [its] ruling, even if we might have ruled differently in the first instance' [citation]." (*Ibid.*)

The trial court balanced the relevant factors here. Romero put B. through a harrowing night of violence, assaulting, kidnapping, and raping her. And those were not his first offenses: At just 28 years old, he has an extensive juvenile and adult criminal record. In the 10 years prior to sentencing alone he suffered convictions for criminal threats (Pen. Code, § 422), stalking (Pen. Code, § 646.9, subd. (a)), lying to a police officer (Pen. Code, § 148.9, subd. (a)), illegally driving or taking a vehicle

11

(Veh. Code, § 10851, subd. (a)), and driving with an open container (Veh. Code, § 23223, subd. (b)).  He also previously committed offenses similar to those committed against B., putting M. through a years-long saga of domestic violence and sexual assaults—including rape.  That evidences Romero's violent and controlling nature toward women and his use of force to commit violent criminal acts against them.  Such conduct exemplifies the recidivist behavior the Three Strikes law was designed to combat.  (See, e.g., *People v. Leavel* (2012) 203 Cal.App.4th 823, 837-838 [long criminal history and violence of current offense justify denial of *Romero* motion]; *People v. Strong* (2001) 87 Cal.App.4th 328, 340 [multiple recent felonies justifies denial of *Romero* motion].)

*Sentences on counts 3 and 4*

Finally, Romero contends the trial court erred when it imposed two-year sentences on counts 3 and 4.  He is incorrect.

If a defendant is convicted of two or more felonies, and the trial court imposes consecutive prison terms, the aggregate term of imprisonment is equal to the sum of the principal term, the subordinate term(s), and any applicable enhancement(s).  (Pen. Code, § 1170.1, subd. (a).)  Subordinate terms are equal to one-third of the middle term of imprisonment prescribed for that conviction.  (*Ibid.*)  For second-strike defendants, like Romero, any subordinate term is then doubled. (*People v. Nguyen* (1999) 21 Cal.4th 197, 207.)

The middle term of imprisonment prescribed for a defendant convicted of domestic violence is three years.  (Pen. Code, § 273.5, subd. (a).)  One-third is one year, and doubling that results in a term of two years.  The sentences imposed on counts 3 and 4 were therefore correct.

12

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

TANGEMAN, J.

We concur:

GILBERT, P. J.

PERREN, J.

Anthony J. Sabo, Judge

Superior Court County of Ventura

_____

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.