Filed 6/15/15  P. v. Abad CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067449 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1300181) |
| RUBEN ABAD et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Eric M. Nakata, Judge.  Reversed.

Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant, Ruben Abad.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant, Anthony Solis.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Ruben Abad and Anthony Christopher Solis in 2013 for the 1989 murder of Herbert Santos. (Penal Code,[1] § 187, subd. (a).) The jury also found true the special circumstance that defendants murdered Santos during the commission of a robbery (§ 190.2, subd. (a)(17)(A)), and Solis admitted the special circumstance that he was previously convicted of murder (§ 190.2, subd. (a)(2)).[2] Defendants were sentenced to life without the possibility of parole.

The prosecutor's theory of the case was that defendants hitched a ride with Santos in Los Angeles County, rode with him to San Bernardino County, robbed him of his wallet and car, stabbed him to death off an isolated frontage road near Interstate 15, left his body in the desert, and fled in his car. The prosecutor argued Abad was the actual killer and Solis was an aider and abettor.

Both defendants claim instructional error regarding Solis's role as a testifying accomplice. Solis contends a jury instruction, which provided "[i]f the crime of murder was committed, then Anthony Solis is an accomplice to that crime," was tantamount to an improper directed verdict or mandatory presumption regarding his status as an aider and abettor. Abad contends that if the jury was instructed that Solis was an aider and abettor, the jury "by process of elimination" was also instructed that Abad was the actual killer. We conclude the instruction was erroneous and that it prejudiced Solis, but not Abad.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    As discussed below, Solis contends he intended only to waive a jury trial on this special circumstance, not to admit it.

Accordingly, we reverse Solis's conviction and set aside his robbery-murder and prior-murder-conviction special circumstances.

Both defendants also claim the trial court erred with respect to the extent to which it found admissible under Evidence Code section 1101, subdivision (b) certain evidence regarding Solis's commission of a similar crime in 1997. The court allowed Abad to elicit on cross-examination of Solis that Solis stabbed someone and took his car, but not that he murdered the victim and was convicted of that murder. Solis contends the court erred by admitting too much; Abad contends the court admitted too little. We conclude the trial court did not err as to Solis, but did as to Abad. Under the circumstances, the court should have admitted all the evidence regarding Solis's 1997 crime and either given a limiting instruction or severed defendants' trials. (*People v. Reeder* (1978) 82 Cal.App.3d 543, 553 (*Reeder*).) Not doing so prejudiced Abad. On that basis we reverse his conviction and set aside the true finding on the robbery-murder special circumstance.

Solis also contends the trial court erred by (1) failing to instruct the jurors that they must reach unanimous agreement regarding the object of the robbery—Santos's car or his wallet, (2) construing his waiver of a jury trial on the special circumstance of his prior murder conviction as an admission of that conviction, (3) providing an erroneous answer to the jury's question during deliberations regarding intent to kill, and (4) denying him an opportunity to introduce evidence correcting allegedly erroneous facts in a probation report. Solis also challenges the sufficiency of the evidence supporting his murder conviction and the true finding on the robbery-murder special circumstance. Finally, he seeks to strike the special circumstance arising from his prior murder conviction because

3

he did not admit, and the jury did not find, that he was the actual killer or, if only an aider and abettor, that he harbored the required intent to kill in the present offense. Abad joins these claims to the extent they relate to guilt issues. Because we reverse defendants' convictions, we address only two of these additional claimed errors: the sufficiency of the evidence (to determine whether defendants may be retried), and the claimed instructional error regarding unanimity (for the trial court's guidance in the event of a retrial). We conclude substantial evidence supports defendants' convictions and true findings, and that a unanimity instruction may be appropriate on retrial.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Prosecution Case*

1.    *The 1989 Investigation*

In March 1989, 56-year-old Santos was living in La Puente, California. On March 19 or 20, he called his sister to tell her he was coming to Las Vegas to live with her and seek work. On the morning of March 21, a pedestrian walking along Stoddard Wells Road off of Interstate 15 near Victorville (in San Bernardino County) found Santos's dead body off the side of the road in the desert. The pedestrian flagged down a passing car and the occupants called 911. While she waited, the pedestrian saw a knife on the ground on the other side of the road near marks that looked like people had been scuffling. She also saw what appeared her to be drag marks leading from the knife to the body.

Detective Michael Lenihan of the San Bernardino County Sheriff's Department was assigned to collect reports and evidence. Lenihan described the crime scene as a remote area on the way to a dumpsite, with no residences or businesses nearby,

4

approximately two miles from the Stoddard Wells Road interchange with Interstate 15. No other roads were visible. Lenihan saw the knife, the scuffle marks, and the drag marks. He also saw blood near the knife. Lenihan observed tire impressions on the east side of the road that continued on to the west side of the road, indicating to him that a vehicle made a U-turn leaving southbound on Stoddard Wells Road.

Santos's body was in some bushes. Lenihan saw blood and a clumping of dirt on the right side of Santos's body. Santos's pants and underwear were off, but he was wearing laced-up shoes, socks, and a sweatshirt. There was foliage on Santos's sweatshirt consistent with being dragged through the desert. Santos's underwear were between his legs and his pants were about six feet from his body. There was no wallet in the pants.

At about 11:15 p.m. on March 21, the California Highway Patrol (CHP) found Santos's car abandoned on the shoulder of Highway 101 near North Hollywood in Los Angeles County. A records check indicated the car was involved in Santos's murder investigation, so CHP had it towed to a secure tow yard. When Lenihan was notified the next day that the car had been found, he had it brought to San Bernardino to be processed.

The driver's window was halfway down. The dashboard and windshield were broken and there was a shoeprint on the windshield. There was blood in the front passenger side of the car. There was a beer can in a caddy in front of the front seat, a Coke can on the driver's side between the seat and the door, and an additional Coke can

5

and bottle under the driver's seat. The blood tracings were sampled and the car and its contents were processed for fingerprints.

The knife and sheath were also processed for latent fingerprints and DNA. No fingerprints were found, but blood on the knife was swabbed for DNA. Because of limitations in searching fingerprint databases in 1989, sheriff's personnel did not identify any suspects in Santos's murder.

On March 23, 1989, Gregory Rieber, a forensic pathologist with the San Bernardino County Coroner's Office, performed an autopsy on Santos. Santos was five feet, seven inches tall, and weighed 164 pounds. He had three stab wounds: two on the right lower chest and one on the side of his chest. The wound patterns were consistent with a single-edged knife and were consistent with the size of the knife recovered from the crime scene. Santos's sweatshirt had caked blood and mud on the lower right front and had two tears in the area of his stab wounds, indicating the sweatshirt had ridden up and exposed his lower chest for the third stab wound. Rieber identified the cause of Santos's death as stab wounds to his liver, which was enlarged and exhibited signs of chronic alcoholic liver disease and cirrhosis. Santos likely would have bled to death within 10 to 30 minutes, faster than someone with a healthy liver. Santos had a blood alcohol level of 0.28 percent, which would have slowed his reaction time. He had no defensive wounds.

Rieber opined the marks in the dirt and the blood spatter at the crime scene were consistent with a struggle and the stabbing of Santos at that location. Santos also had postmortem abrasions across his lower back and buttocks consistent with being dragged.

6

On March 28, 1989, Detective Lenihan learned that an employee at a KOA campground near the Stoddard Wells Road/Interstate 15 interchange recovered a wallet with an identification card and other paperwork belonging to Santos. There was no cash in the wallet. Lenihan and another detective interviewed the campground's assistant manager, Nancy Abbott, who reported that the wallet had been found seven to 10 days earlier.

The detectives showed Abbott a photograph of Santos. She told them he had been at the campground about a week or two earlier with two other men and that they bought sodas or beer. Abbott described Santos as "fairly well dressed and clean looking," and the other two men as younger and "quite ratty and transient-looking." She could not understand why they were together.

2. *The 2012 Investigation*

In 2012, detectives Ryan Ford and Scott Cannon with the San Bernardino County Sheriff's homicide detail were investigating Santos's unsolved murder as a "cold case." Physical evidence from the crime scene led them to defendants. Abad's fingerprints and a palm print were on the exterior of the car windows in a position consistent with Abad sitting inside the car with the windows rolled down. Several of Solis's prints were also found inside the car, including one from the Coke can that was between the driver's door and driver's seat. DNA analysis of blood specks found both inside the car (under the dashboard) and outside the car (the rear passenger door) matched Solis. Specks of Solis's blood were also found on Santos's sweatshirt.

7

### a) *Abad's Interview*

Detectives Ford and Cannon went to Abad's home in Bakersfield. He agreed to give an audiotaped interview at the local police station.[3]

Abad was born in 1964, which would have put his age at 24 in March 1989. He said he was from Santa Maria, California and lived there until 2005 or 2006. Abad denied ever being in La Puente or on Interstate 15 heading toward Las Vegas in the late 1980's or early 1990's. He denied ever hitchhiking and, when the detectives showed him a photo of Santos's car, denied ever getting a ride in it. When detectives showed him a photo of Solis and stated his name, Abad said he was not sure if he recognized the photo and had only "heard of" Anthony and did not know Anthony's last name. Detective Ryan, however, noted that when he showed the photo, Abad's "shoulders and his body kind of stiffen[ed]," which was the first instance in which there was a "change in his body language." The detectives then showed Abad three photos of randomly selected Hispanic males to gauge his reaction. Abad slowly relaxed and resumed his original posture. Then the detectives showed him a photo of Santos and asked if he knew someone by that name. Abad said he did not recognize the photo or the name, but, once again, his posture changed. Abad relaxed again after a few minutes.

The detectives told Abad there was physical evidence tying him to Santos's car, and they accused him of stealing the car with Solis. Abad denied ever stealing any car, but offered no explanation for why physical evidence would indicate he had been in

---

[3]     Abad did not testify at trial, but the jury heard his interview.

Santos's car. The detectives then told Abad they were investigating the murder of the car's owner and that they had evidence placing him in the car around the time of the murder. Abad asked to leave the interview. The interview ended and detectives took fingerprint and DNA samples from Abad pursuant to a search warrant.

### b) Solis's Interview

The detectives interviewed Solis at a state prison in Chino, where he was serving a life sentence for a murder he committed in 1997 for which he was convicted in 2000. Solis initially denied any knowledge of the crime and claimed not to recognize Santos or Abad in photos the detectives showed him. Solis told the detectives they "really couldn't do a whole lot to [him]" because he "had already been doing time." However, when the detectives alluded to the death penalty, Solis relented and told them that he was present when Abad killed Santos without Solis's participation.

### B. Solis's Defense Case

Solis testified at trial. He lived in Lompoc, California in 1989. In early 1989, he spent about two months in a residential group treatment home in Baldwin Park (in Los Angeles County), where he first met Abad. Abad arrived later, and their stays overlapped by about two or three weeks. They discovered they were both from the same general area, and Solis knew of Abad's brothers, but not Abad. Sometime in March 1989, Solis decided to leave the home and return to Lompoc. Abad decided to leave with Solis and travel together back to the Lompoc/Santa Maria area. They walked from the Baldwin Park group home to a bus stop in neighboring La Puente, intending to catch a local bus to

9

a Greyhound station in El Monte. They drank beer as they walked. Around 11:30 a.m., Santos drove by the bus stop in his car, circled back around, and offered defendants a ride. Defendants accepted.

The three men stopped at a liquor store, bought beer and wine, and then just "cruised around," "aimlessly." Around 2:00 p.m., when Santos decided he was too intoxicated to drive, Solis started driving, with Santos in the front passenger seat and Abad in the rear. Santos directed Solis to the freeway and passed out sometime later.

As Solis drove Santos's car north on Interstate 15 toward Las Vegas in the Victorville area, Santos woke up, said something to the effect of "what the F is going on?" and hit Solis on the right side of his face with a wine bottle. Solis began bleeding. As he attempted to block further blows by Santos, Solis exited the freeway to avoid crashing. As Solis was doing so, Abad reached over from the back seat and stabbed Santos twice. Solis was not previously aware that Abad had a knife.

After Solis stopped the car, Abad and Santos got out and fought. Solis saw Abad stab Santos a third time. As Abad and Santos moved toward the front of the car, Solis waited behind the rear passenger side to avoid being caught up in the fight. Solis lost sight of Abad and Santos and returned to the front passenger seat of the car; he was in no condition to drive because his head was still bleeding from being hit with the wine bottle.

Abad returned to the car a few minutes later without Santos, and he and Solis drove off toward Los Angeles. Worried how he would explain his bleeding if stopped by police, Solis intentionally broke the dash board by kicking it and put his blood on it. As they drove through Los Angeles on the way to the Lompoc/Santa Maria area, Santos's car

10

broke down on the freeway. At Abad's direction, defendants wiped their fingerprints from the car before abandoning it. They walked to a Greyhound station and took a bus to the Lompoc/Santa Maria area, where they parted ways and never spoke again.

Solis denied participating in the assault on Santos or in dragging the body away. He did not intend for Santos to be robbed or killed, and did not even know for certain whether Santos was dead when he was abandoned in the desert. Solis denied taking Santos's wallet or even knowing that he had one. He also denied ever going to the KOA campground. Solis admitted he initially lied to the detectives who interviewed him. He further admitted to a felony conviction in 1990 for robbery and assault, two felony convictions in 1992 for theft, and one felony conviction in 2000 for stabbing and theft.[4]

C.      *The Prosecution's Rebuttal Case*

Mark Correa testified that in 1989 he was a minister working with a network of churches that operated residential facilities in California and that Solis was a resident of the La Puente home in 1989. Solis left the home with another resident.

Pastor Edward Maestas testified he was also involved with the La Puente group home. He recognized Solis as having resided at the home for less than a month. After Solis left the home, there were reports of property missing. Solis left the home with a person from the Santa Maria area. A few days after Solis left, he called Maestas and asked if he and the person he left with could return to the home. Maestas said no.

Detective Ford testified that during his interview of Solis, Solis was the first to mention that the cause of Santos's death was stabbing.

---

[4]      The jury was not informed Solis's conviction in 2000 was for murder.

11

*D.     Conviction and Sentencing*

The jury ultimately convicted both defendants of first degree murder and found true the robbery-murder special circumstance. Prior to trial, Solis waived his right to a jury trial on his prior-murder-conviction special circumstance, which the trial court interpreted as Solis admitting to the prior conviction. The court sentenced both defendants to the prescribed term of imprisonment for life without the possibility of parole.

DISCUSSION

I.

*INSTRUCTIONAL ERROR REGARDING ACCOMPLICE LIABILITY*

Defendants contend the trial court erroneously instructed the jury regarding Solis's status as a testifying accomplice, which resulted in an impermissible directed verdict or burden-shifting presumption. The trial court instructed the jury, for purposes of the rule requiring that a testifying accomplice's testimony be corroborated by independent evidence, that "[i]f the crime of murder was committed, then Anthony Solis is an accomplice to that crime." Solis argues that because "[a] murder was indisputably committed," this instruction was tantamount to directing a verdict—or at least imposing a mandatory presumption—that Solis was therefore guilty as an aider and abettor. Abad argues that by instructing the jury that Solis is an *accomplice*, "by process of elimination," the trial court was directing a verdict that Abad was guilty as the *perpetrator*. We conclude the trial court committed instructional error, which was prejudicial to Solis but not to Abad.

12

*A.    Background*

The prosecutor argued at trial that Abad stabbed Santos, and Solis was liable as an aider and abettor.[5]  This theory was supported in part by Solis's testimony, which implicated Abad as the perpetrator, but denied liability as an aider and abettor.  But because Solis was a potential accomplice, and because a defendant (Abad) cannot be convicted based on the uncorroborated testimony of an accomplice (as discussed below), the trial court instructed the jury with CALCRIM No. 335 as follows:

> "*If the crime of murder was committed, then Anthony Solis is an accomplice to that crime.*
>
> "You may not convict the defendant Abad of murder based on the statement or testimony of an accomplice alone.  You may use the statement or testimony of an accomplice to convict the defendant Abad only if:
>
> "1.     The accomplice's statement or testimony is supported by other evidence that you believe;
>
> "2.     That supporting evidence is independent of the accomplice's statement or testimony;
>
> "AND
>
> "3.     That supporting evidence tends to connect the defendant to the commission of the crimes.
>
> "Supporting evidence, however, may be slight.  It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the accomplice testified.  On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the

---

5     The prosecutor stated in his opening statement, "You have to determine the killer and the non-killer . . . .  One person did it.  I would argue it's Mr. Abad."

circumstances of its commission.  The supporting evidence must tend to connect the defendant to the commission of the crime.

"Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution.  You may not, however, arbitrarily disregard it.  You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."  (Italics added.)

The trial court also gave CALCRIM No. 301, which provides as follows:  "Except for the testimony of Anthony Solis, which requires supporting evidence *if you decide he is an accomplice*[,] [t]he testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, carefully review all the evidence."  (Italics added.)  The prosecutor, believing Solis's status as an accomplice was beyond dispute, proposed a version of CALCRIM No. 301 that placed our italicized portion in brackets, intending for the court to omit it.  However, the court read the jury the bracketed language.

After the trial court instructed the jury, the court held a sidebar conference at the prosecutor's request.  The prosecutor said, "I thought you were going to get rid of the bracketed portion, 'he is an accomplice.' "  Solis's counsel and the trial court responded that whether Solis is an accomplice "is up to the jury to decide."  Realizing Solis's status as an accomplice was disputed, the prosecutor advised the court that "[t]he instruction we gave them [CALCRIM No. 335] is that [Solis] is an accomplice," whereas "the Court

14

should have given [CALCRIM No.] 334," which leaves that determination to the jury.[6]

The following exchange then occurred, in which the trial court blamed counsel and rationalized why CALCRIM No. 335 was still applicable:

> "THE COURT:  Well, I gave what you guys gave me.  I read what you read.  I can't help it if you messed it up.  Don't tell me I'm supposed to read something if you didn't give it to me to read.
>
> "[Prosecutor]:     We all agreed on 335.
>
> "THE COURT:  What?
>
> "[Prosecutor]:     We all agreed on 335 . . . .  That's the instruction we all agreed on.  [¶]  There was no objection from either defense counsel as far as that instruction goes; now there is objection.
>
> "THE COURT:  I don't know they are objecting.  What they are saying and what I agree with, 335 says, 'If the crime of murder was committed, then and only then, Solis is an accomplice to that crime.'  'If.'  And the wording of that is equivocal.  Actually, the wording is that the jury still has to find that there was a murder; right?  That's what it says.  Correct?
>
> "[Prosecutor]:     Correct.
>
> "THE COURT:  They can find there was, and they are not guilty.
>
> "[Prosecutor]:     As long as there is no objection to giving that instruction.

---

6     CALCRIM No. 334 is titled "Accomplice Testimony Must Be Corroborated: Dispute Whether Witness Is Accomplice," and provides (in part) as follows:  "*Before you may consider the (statement/ [or] testimony) of <insert name[s] of witness[es]> as evidence against (the defendant/<insert names of defendants>) [regarding the crime[s] of <insert name[s] of crime[s] if corroboration only required for some crime[s]>], you must decide whether <insert name[s] of witness[es]>) (was/were) [an] accomplice[s] [to (that/those) crime[s]].  A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant.*"  (Underscoring and some italics added.)

"THE COURT: [Abad's counsel], [Solis's counsel], do you object?

"[Abad's counsel]: No.

"[Solis's counsel]: No objection.
"THE COURT: They're not objecting. It is what it is. Okay. Take a few minutes. Off the record."

B.    *Legal Framework*

Section 1111 provides that a "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." An "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*) " 'A witness is liable to prosecution within the meaning of section 1111 if he or she is a principal in the crime.' [Citation.] A principal includes those who 'directly commit the act constituting the offense' and those who 'aid and abet in its commission.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 968 (*Carrasco*), quoting § 31.) Liability "as an aider and abettor requires proof that the person in question 'aid[ed] or promote[d] the perpetrator's crime with knowledge of the perpetrator's unlawful purpose and an intent to assist in the commission of the target crime.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 93 (*Manibusan*).) "Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law." (*People v. Valdez* (2012) 55 Cal.4th 82, 145.)

16

As noted above, the Judicial Council of California has formulated two instructions that address accomplice testimony and the need for corroboration:  CALCRIM Nos. 334 and 335.  The former applies when there is a dispute as to whether the witness was an accomplice; the latter applies when the witness is an accomplice as a matter of law (for example, when the witness is a codefendant who confesses on the stand and implicates his fellow codefendants (*People v. Hill* (1967) 66 Cal.2d 536, 555 (*Hill*)).  Both inform the jury it cannot convict the defendant based upon the testimony of an accomplice, absent other evidence—evidence independent of the witness's testimony—that tends to connect the defendant to the crime.  (CALCRIM Nos. 334, 335.)  Both also inform the jury that the corroborating evidence may be slight and that an accomplice's testimony should be viewed with caution.  (*Ibid.*)  However, CALCRIM No. 335 instructs the jury that a particular witness *is* an accomplice, whereas CALCRIM No. 334 defines an accomplice in accordance with section 1111 and places on the defendant the burden of proving the witness was an accomplice.  (*Ibid.*)

Jury instructions that relieve the prosecution of the burden of proving each element of the charged offense beyond a reasonable doubt violate a defendant's due process rights under the United States and California Constitutions.  (*People v. Flood* (1998) 18 Cal.4th 470, 480-481, 491 (*Flood*).)  Such erroneous instructions also violate United States and California constitutional principles requiring all material issues be decided by the trier-of-fact.  (*Ibid.*)  Although a trial court may direct a verdict for a defendant if the evidence is legally insufficient to establish guilt, under no circumstances may a court direct a verdict for the prosecution.  (*Ibid.*; *People v. Kobrin* (1995) 11

17

Cal.4th 416, 423.)  Furthermore, the "prohibition against directed verdicts for the prosecution extends to instructions that effectively prevent the jury from finding that the prosecution failed to prove a particular element of the crime beyond a reasonable doubt." (*Flood*, *supra*, at p. 491.)

An instruction that requires the jury to find an elemental fact based on proof of a predicate fact is unconstitutional because it "subvert[s] the presumption of innocence accorded to accused persons and also invade[s] the truth-finding task assigned solely to juries in criminal cases."  (*Carella v. California* (1989) 491 U.S. 263, 265 (*Carella*); *People v. Vanegas* (2004) 115 Cal.App.4th 592 (*Vanegas*).)  "In determining whether a challenged instruction constitutes an impermissible mandatory presumption we put ourselves in the place of the jurors and ask whether the instruction, 'both alone and in context of the overall charge, could have been understood by reasonable jurors to require them to find the presumed fact if the State proves certain predicate facts.' "  (*Vanegas*, *supra*, 115 Cal.App.4th at pp. 599-600, quoting *Carella*, *supra*, 491 U.S. at p. 265.)

C.    *Analysis*

The People concede, as they must, that "the trial court erred in instructing the jury with CALCRIM No. 335."  Solis's status as an accomplice was disputed.  Yet, the instruction imposed a mandatory presumption by requiring the jury to find an elemental fact ("Solis is an accomplice"—that is, a perpetrator or aider and abettor—to the crime of murder) based on proof of a predicate fact ("that the crime of murder was committed") (*Vanegas*, *supra*, 115 Cal.App.4th at p. 599), thus obviating the need for the jury to

18

determine whether Solis acted as an aider an abettor and did so with the requisite intent. (*Manibusan*, *supra*, 58 Cal.4th at p. 93.)

The People argue the error does not require reversal because defendants "invited the error by agreeing to the erroneous instruction." We disagree. "As appellate courts have explained time and again, merely acceding to an erroneous instruction does not constitute invited error." (*People v. Smith* (1992) 9 Cal.App.4th 196, 207, fn. 20.) Rather, "[i]nvited error will be found . . . only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction." (*People v. Souza* (2012) 54 Cal.4th 90, 114.) The People do not articulate any tactical advantage either defendant may have sought to obtain by agreeing to CALCRIM No. 335. Thus, the doctrine of invited error does not apply.

The standard of reversal applicable to an instructional error that creates an improper mandatory presumption is the *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) "harmless beyond a reasonable doubt" standard. (*Vanegas*, *supra*, 115 Cal.App.4th at p. 602; *Flood*, *supra*, 18 Cal.4th at pp. 502-503.). In finding this standard applicable, we are not persuaded by Solis's argument that the instructional error rises to the level of an impermissible directed verdict, which would constitute structural error requiring reversal per se. The only case Solis cites for this proposition states the rule in dicta and goes on to conclude that the jury instruction at issue there created a mandatory presumption regarding the malice element of homicide, which the Supreme Court held was subject to *Chapman* review. (See *Rose v. Clark* (1986) 478 U.S. 570, 579-580.) Nor are we persuaded by the People's argument that the instructional error here arose from

19

ambiguous instructions, which are subject to reversal only if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." (*People v. Huggins* (2006) 38 Cal.4th 175, 192.) The record reveals nothing ambiguous about CALCRIM No. 335. It told the jury precisely what to do if it found a murder had been committed: find that Solis was an accomplice to that murder. We must now determine whether either defendant suffered prejudice under *Chapman*.

       1.       *The Instructional Error Prejudiced Solis*

On the record before us, we cannot say we are convinced beyond a reasonable doubt that the erroneous instruction did not contribute to Solis's conviction because we cannot say the mandatory presumption was unimportant in relation to everything else the jury considered regarding Solis's role in Santos's murder. (*Vanegas*, *supra*, 115 Cal.App.4th at p. 602.)

The People argue that CALCRIM No. 335 was not prejudicial in the context of the overall charge to the jury. The People note the jury was instructed that defendants were presumed innocent until proven guilty beyond a reasonable doubt and that either defendant could be found guilty or not guilty of murder. However, this does not eliminate all potential for mischief by the erroneous instruction. On one hand, the jury could have found that neither defendant murdered Santos, in which case the presumption of innocence would prevail and the jury could find both defendants not guilty. On the other hand, if the jury found Abad guilty of murder, the jury could reasonably have concluded CALCRIM No. 335 required them to also find Solis guilty as an accomplice.

20

The People also point to CALCRIM No. 301, which provides that "[e]xcept for the testimony of Anthony Solis, *which requires supporting evidence if you decide he is an accomplice*, the testimony of only one witness can prove any fact." Although the People do not explain why they contend this instruction is significant, we presume it is because it appears to leave to the jury the decision whether to find Solis is an accomplice. We are not persuaded. Even if CALCRIM No. 301 purported to leave that decision to the jury, CALCRIM No. 335 told the jury how to make that decision: "If the crime of murder was committed, then Anthony Solis is an accomplice to that crime." In other words, the only thing the jury had to decide to determine whether Solis was an accomplice was whether "the crime of murder was committed." If the jury concluded the crime of murder was committed by Abad—as the prosecutor and Solis argued—then CALCRIM No. 335 instructed the jury to find Solis was an accomplice to that crime.

The People assert Solis suffered no prejudice because the prosecutor did not conduct himself as though any presumption applied, but rather, explained that Solis's testimony had to be corroborated by other, independent evidence. However, the court also instructed the jury: "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Thus, the jury could reasonably have found CALCRIM No. 335 applied regardless of the prosecutor's conduct.

Finally, the People note that the jury engaged in lengthy deliberations and even asked the judge a question about the intent-to-kill requirement for an accomplice. Neither point convinces us that Solis was not prejudiced. First, after 10 days of trial, the jury returned a verdict after only about six hours of deliberations (1.5 hours the first

21

afternoon, 4.5 hours the next court day). In *Vanegas*, *supra*, 115 Cal.App.4th at p. 603, fn. 19, the court observed that the jury's ability to sort through potential verdicts and render its decision after four hours of deliberation supported the inference that the jury was influenced by a mandatory presumption. Indeed, the court observed that once the jury determined the predicate fact, "the jurors could have viewed [considering the elemental fact] a waste of time and contrary to their instructions." (*Id.* at p. 603.) Similarly, the brevity of this jury's deliberations in light of the length and complexity of the trial supports the inference that the jury's evaluation of Solis's guilt as an aider and abettor was influenced by CALCRIM No. 335's instruction that "[i]f the crime of murder was committed, then Anthony Solis is an accomplice to that crime."

Second, the jury's question about the intent-to-kill requirement for an accomplice does not convince us beyond a reasonable doubt that the erroneous jury instruction did not contribute to the verdict. After approximately 3.75 hours of deliberation (1.5 the first afternoon and 2.25 the next court day), the jury asked: "With respect to instruction [no.] 701: 'Intent required for accomplice,' please define 'intent to kill.' Would leaving a person to die after another person stabbed him qualify as 'intent to kill[?] ' " After consulting with counsel, the court responded, "That is for you, jurors to decide." Less than two hours later, the jury notified the court that it had reached a verdict. The People argue that the jury's question indicates the jurors did not feel compelled to find Solis guilty as an accomplice. While that is one reasonable inference, another is that the lack

22

of substantive guidance in response to the question caused the jury to rely more heavily on CALCRIM No. 335 to find Solis was an accomplice.[7]

On balance, the context of the overall charge to the jury, the prosecutor's argument at trial, the length of the jury's deliberations, and the jury's question regarding intent-to-kill do not convince us beyond a reasonable doubt that the erroneous instruction was harmless as to Solis.  Accordingly, we reverse Solis's conviction and set aside his robbery-murder and prior-murder-conviction special circumstances.

2.      *The Instructional Error Did Not Prejudice Abad*

Abad argues he was prejudiced by CALCRIM No. 335 because once it told the jury that Solis was an *accomplice*, "[t]he jury would have been forced to conclude that . . . , by process of elimination Abad was the *perpetrator*."  (Italics added.)  This argument fails because it erroneously presupposes that an accomplice can only be an aider and abettor.

*People v. Heishman* (1988) 45 Cal.3d 147 (*Heishman*) addressed a similarly erroneous claim.  There, the defendant was charged with murdering a woman to prevent her from testifying that he had raped her.  (*Id*. at pp. 156-157.)  Nancy Gentry, a woman with whom the defendant was romantically involved, testified she drove the defendant to the victim's home, lured the victim outside, and drove the defendant from the scene after the murder.  (*Id*. at pp. 158-159.)  The defendant's theory at trial was that Gentry killed the victim, acting on her own.  (*Id*. at p. 162.)

---

7      As previously noted, we need not address the propriety of the trial court's response to the jury's question.

23

The jury was given the following instructions regarding the difference between a perpetrator and an accomplice, and the requirement for corroboration of an accomplice's testimony:

> "The jury instructions defined principals as including those who directly and actively commit the crime and those who aid and abet in its commission with knowledge of the unlawful purpose of the one who does directly and actively commit it (the perpetrator). As to accomplices, the jury was instructed: 'An accomplice is one who is or was subject to prosecution for the identical offense charged against the defendant on trial. To be an accomplice, the person must have aided, promoted, encouraged, or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person who committed the offense.' (CALJIC No. 3.10 (1979 rev.).) '[In the crime of murder,] [i]f the crime of [murder] was committed by anyone, the witness [Nancy Gentry] was an accomplice as a matter of law and her testimony is subject to the rule requiring corroboration.' (CALJIC No. 3.16, bracketed words added by the court.)"

(*Heishman*, *supra*, 45 Cal.3d at p. 162.)

On appeal following his conviction, the defendant argued, based on the instructions quoted above, that "the jury was thereby directed to find that Gentry was an accomplice in the sense of one who assists another and was precluded from finding that she acted alone." (*Heishman*, *supra*, 45 Cal.3d at p. 162.) The California Supreme Court rejected this argument, explaining that Gentry could be both an accomplice and the actual killer:

> "The instructions did not literally tell the jury it could not find Gentry was the killer. And Gentry was legally an accomplice 'if the crime of murder was committed by anyone' including Gentry herself. CALJIC No. 3.16 was given to make clear that Gentry was being labeled an accomplice for purposes of the rule requiring corroboration if her testimony were believed. The instruction could not reasonably be understood as precluding rejection of her

24

testimony—including rejection based on a conclusion that in fact she was the killer.  [Citation.]  Defendant's interpretation of the instruction would make it practically a direction of conviction.  Yet the jury was fully instructed on the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt."

(*Heishman*, *supra*, 45 Cal.3d at pp. 162-163.)

Similarly, in *People v. Morris* (1991) 53 Cal.3d 152 (*Morris*), the trial court instructed the jury that two witnesses were accomplices as a matter of law, and defined an accomplice as essentially an aider and abettor.  (*Id*. at p. 210.)  The defendant argued the trial court's refusal to instruct the jury that "an accomplice could also be a person who 'directly' committed the crime" resulted in a conclusive presumption against his defense that two testifying accomplices "were the actual killers."  (*Id*. at p. 211.)  The Supreme Court followed its precedent in *Heishman* and rejected the claim.  (*Ibid*.)

Under *Heishman*, *supra*, 45 Cal.3d 147 and *Morris*, *supra*, 53 Cal.3d 152, we must reject Abad's argument that CALCRIM No. 335 left the jury no choice but to conclude, "by process of elimination," that if Solis was an accomplice, Abad must have been the perpetrator.  An accomplice can be either a perpetrator *or* an aider and abettor.  (§ 31; *Carrasco*, *supra*, 59 Cal.4th at p. 968.)  Therefore, simply because the jury was instructed that Solis was an accomplice—that is, a perpetrator *or* an aider and abettor—it does not follow that the jury was instructed that Abad could only have been the perpetrator.  Abad's argument is even less persuasive than the defendants' in *Heishman* and *Morris*, where the jury instructions defined an accomplice essentially as being an aider and abettor, suggesting more strongly that the non-testifying defendant was the actual

25

perpetrator. If our Supreme Court found no error under those circumstances, we certainly find none here.

Abad also argues more generally, citing *Hill*, *supra*, 66 Cal.2d 536, that instructing the jury that Solis was an accomplice as a matter of law "could be viewed by the jurors as an unintentional imputation of [Solis's] guilt to [Abad]." The concern addressed in *Hill*, however, arises "where a codefendant has made a judicial confession as to crimes charged," such that "an instruction that as a matter of law such codefendant is an accomplice of other defendants might well be construed by the jurors as imputing the confessing defendant's foregone guilt to the other defendants." (*Id*. at p. 555.) Here, there is no confessed guilt to impute to Abad; to the contrary, Solis denied guilt and implicated Abad. Thus, *Hill* is inapposite.

In sum, although the trial court erroneously instructed the jury that Solis was an accomplice as a matter of law, we conclude Abad was not prejudiced by the instruction. If anything, Abad benefitted by the jury having been instructed that Solis's testimony against him must be corroborated.

II.

*ADMISSIBILITY OF SOLIS'S 1997 MURDER AND CONVICTION*

Abad and Solis each appeal the trial court's admittedly "weasely" compromise ruling regarding the extent to which evidence regarding Solis's conviction in 2000 for a murder he committed in 1997 would be admissible to show a common design and plan between that murder and Santos's. Abad contends the court erred by admitting too little detail, while Solis contends the court admitted too much. We agree with Abad that the

26

trial court erred by over-sanitizing the details regarding Solis's prior murder and that this error prejudiced Abad. We disagree with Solis.

*A.     Background*

Solis was convicted in 2000 for a murder he committed in 1997 in which he stabbed the victim, left his body by the side of a freeway, and drove off in the victim's car. Robbery was the apparent motive in the 1997 murder.

Abad raised via motion in limine the extent to which the 1997 murder would be admissible. Abad's counsel advised the court that if Solis testified, Abad's counsel would seek to use Solis's subsequent offense to show a common design and plan between that murder and Santos's, which would support Abad's defense theory that Solis robbed and murdered Santos without Abad's participation.[8] (Evid. Code, § 1101, subd. (b).) The prosecutor advised the court that if Solis testified, the prosecutor would seek to use the murder conviction—along with Solis's other felony convictions—solely for purposes of impeaching Solis's credibility. (Evid. Code, § 788.) Solis's counsel objected to admission of the subsequent offense as either impeachment or common design or plan evidence.

---

[8]     Abad's counsel also argued he would use the subsequent offense to show that Solis learned from his prior conviction—in which he did not testify—that it would behoove him to testify and blame his alleged accomplice. We need not address this aspect.

27

Regarding the prosecutor's intent to use the 2000 conviction as impeachment evidence under Evidence Code Section 788, the trial court stated, "I can think of no greater prejudice to Mr. Solis than to allow in a prior or a subsequent murder."[9] The prosecutor responded, "I would probably lose if I sought to introduce the fact that [Solis] was convicted of a murder, but I don't want to do that. I just want to introduce the fact that he's been convicted of various felonies, which is relevant [to his credibility]." The prosecutor reiterated that he did not intend to use the subsequent offense as common design or plan evidence under Evidence Code section 1108, subdivision (b).

Abad's counsel then requested that defendants' trials be severed, and explained why he had not requested this earlier:

> "I didn't ask for a severance in this case, and if I can explain and make the record. It was represented by [Solis's counsel] that Mr. Solis was not going to testify. It became an issue that—and I know that he has that right, but it became an issue just recently that there might be an issue of Mr. Solis testifying. What we have now is that if Mr. Solis does testify, then I represent Mr. Abad. [¶] . . . [¶] And Mr. Abad has certain fundamental rights, and one of those rights is to have a vigorous cross-examination of his accuser.
>
> [¶]
>
> "And so I think that what's happening is, depending on how the Court rules, it's actually creating an issue for a severance that I know that the Court would have liked me to bring before, but again, it was represented that neither of the clients were going to testify. Well, Mr. Solis. So I apologize, but this is something that I think that the Court should consider, especially since my client's fundamental trial

---

[9] There was some confusion regarding how to characterize the 1997 offense and 2000 conviction because they were *subsequent* to Santos's 1989 murder, but *prior* to defendants' murder trial.

28

rights are at issue. [¶] And I will just proffer to the Court that there's not a lot of evidence against my client other than Mr. Solis."

The trial court responded, "If you're making a motion to sever at this point, your motion is denied, all right? There's just not—well, first of all, it's not timely. Second of all, there is no reason at this point to do that because I haven't ruled yet."

Solis's counsel reiterated his objection that "any kind of description of subsequent murder or certainly the facts and circumstances surrounding the subsequent murder" would be "highly prejudicial" and "almost directing a verdict against Mr. Solis." The court responded, "Well, maybe yes and maybe no. I mean, that's up to the jury to decide whether or not there is that common plan or scheme." The court then gave the following ruling:

> "The fact that Mr. Solis was involved in a very similar type of incident which involved the same type of result as this case, the probative value of the other crime, evidence to prove or disprove the facts of this case, I think as [Abad's counsel] sits there, he has to, given the statement of Mr. Solis, defend his client. I think that it's paramount from [Abad's counsel]'s standpoint.
>
> "And the existence of any rule or policy requiring exclusion in this matter, and I hate to do the weasely thing to do in my analysis, but that seems to be the fairest thing in my mind to do.
>
> "The – [Abad's counsel], you will be allowed to use . . . the subsequent murder but not identify it as a subsequent murder. I agree with [the prosecutor] that it is the middle road here. The court will allow you under [Evidence Code section] 1101[, subdivision] (b) and find that the probative value of the prior, even though it is eight years later, that is a factor that I have to consider, but I think that given the gravity of that and the gravity of this case that it is a factor that is not as great as the factors that show a common plan, design in this case.

29

"The specific questions that you mentioned yesterday, I will allow you, should Mr. Solis testify, to ask with the exception that you must avoid the subsequent conviction. The jury is not to be made aware through your questioning that it was a prior murder."

The court clarified that Abad's counsel could ask Solis if he was "accused of stabbing an individual," but could not elicit that the victim died or that Solis was convicted of murder.

The trial court also clarified that in finding Solis's subsequent murder offense admissible under Evidence Code section 1101, subdivision (b), the court had balanced its probative value against its potential prejudice:

"I think that I have to make it abundantly clear that I have made the analysis under Evidence Code [s]ection 352, and I find that the probative value in asking Mr. Solis those questions and in allowing Mr. Solis to do that outweighs its prejudice, even though – and we have – because of the extreme prejudice of the prior of subsequent murder, the Court is allowing [Abad's counsel] to cross-examine Mr. Solis should he testify but not go into the subsequent charge. So that's for the record."

Solis testified during trial, portrayed himself as a victim of Santos, and blamed Abad for the murder. Abad's counsel cross-examined Solis regarding his subsequent murder as follows:

"Q And then you talked about how in 2000 you were actually convicted of stabbing a person and robbing them; correct?

"A I wasn't – I didn't talk about it. I admitted to it.

"Q Okay. And that involved you stabbing a person and taking their car and driving home with it, didn't it?

"A Correct."

30

*B.        Admissibility and Prejudice as to Solis*

Solis contends the trial court erred by admitting evidence regarding his 1997 murder to establish a common design or plan.  Although we need not address Solis's claimed error because we reverse his conviction on other grounds, we nonetheless address it because it relates to Abad's challenge and for the guidance of the trial court in the event of a retrial.

"Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, footnote omitted (*Ewoldt*).)[10]

"[E]vidence of a defendant's uncharged misconduct is admissible where the uncharged misconduct and the charged offense are sufficiently similar to support the

_____

10        Evidence Code section 1101 states:  "(a) Except as provided in this section and in [Evidence Code s]ections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.  [¶]  (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.  [¶]  (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

inference that they are manifestations of a common design or plan."  (*Ewoldt*, *supra*, 7 Cal.4th at pp. 401-402.)  "[E]vidence of a common design or plan is admitted not to prove the defendant's intent or identity, but to prove that the defendant engaged in the conduct alleged to constitute the charged offense."  (*Id*. at p. 399.)  In other words, "Evidence of a common design or plan is admissible to establish that the defendant committed the *act* alleged."  (*Id*. at p. 394, fn. 2.)

"To establish a common design or plan, the evidence must demonstrate not merely a similarity in the results, but ' "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." ' "  (*People v. Balcom* (1994) 7 Cal.4th 414, 423-24 (*Balcom*), quoting *Ewoldt*, *supra*, 7 Cal.4th at pp. 393-394.)  "[T]he common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual."  (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.)  "The circumstance that the uncharged offense occurred *after* the charged offense does not lessen its relevance in demonstrating the existence of a common design or plan."  (*Balcom*, *supra*, 7 Cal.4th at p. 425.)  We review the trial court's decision to admit evidence under Evidence Code section 1101, subdivision (b) for an abuse of discretion. (*People v. Harris* (2013) 57 Cal.4th 804, 841.)

The trial court did not abuse its discretion in finding Santos's murder and the 1997 murder committed by Solis sufficiently similar to establish a common design or plan.  In both cases, the victim was stabbed to death, the victim's body was left on the side of the

32

freeway, the assailant drove off in the victim's car, and robbery was suspected as the primary motive.

Solis argues the crimes are not sufficiently similar because the 1997 victim was stabbed 100 times, whereas Santos was stabbed only three times. He argues "[t]his suggests a sharply different motivation" in the 1997 murder, such as a "rage killing." This distinction does not convince us that the trial court erred in finding the other similarities sufficient to support an inference of a common design or plan.[11]

Solis asserts that the fact that the victims' vehicles were taken in both cases "shows only that [Solis] needed transportation home after committing the crime." However, the similarity also supports the inference that robbery was the motivation in both cases.

Solis argues the eight-year gap between Santos's murder in 1989 and the 1997 murder also undermine the trial court's finding. We are unpersuaded. Our Supreme Court has affirmed the admissibility of evidence of crimes separated by almost twice as many years. (See, e.g., *Ewoldt*, *supra*, 7 Cal.4th at p. 405 [12 years]; *People v. Ing* (1967) 65 Cal.2d 603, 612 [15 years].)

The People side with Solis in arguing that the subsequent murder was inadmissible. They suggest Abad is now contradicting himself because his counsel argued to the trial court that "the two murders were substantially dissimilar." This

---

[11]     In another context, Solis argues in his opening brief that the fact that Santos's pants and underwear were removed suggests the crime was motivated more by a desire to humiliate and dehumanize than to rob. If Solis is correct about this and about the motive of the 1997 murder being emotional rather than financial, then the murders are even more similar.

33

argument is disingenuous. The record reveals that when Abad's counsel was acknowledging the differences between the murders he was doing so only to explain that they were not similar enough to satisfy the heightened standard applicable to establishing identity. (*Ewoldt*, *supra*, 7 Cal.4th at p. 403 ["The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. . . . 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' "].)

We, therefore, conclude the trial court did not abuse its discretion in finding evidence regarding the 1997 murder admissible under Evidence Code section 1100, subdivision (b). This conclusion, however, does not end our inquiry because "to be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 404.) The trial court specified for the record that it did not find that the "extreme prejudice" to Solis of admitting evidence of the "very similar" crimes substantially outweighed the "paramount" importance to Abad. Again, we find no abuse of discretion.

The probative value of the evidence of Solis's 1997 murder stems from its similarity to the circumstances of Santos's murder. The probative value of this evidence is increased because its source is independent of the evidence regarding Santos's murder.

34

(*Balcom*, *supra*, 7 Cal.4th at p. 427.)[12]  However, it is decreased by its slight

dissimilarities and remoteness in time.  (*Ibid.*)

Regarding the prejudicial impact of the evidence, the fact that Solis was convicted

of the 1997 murder decreases, in at least one way, the potential for prejudice, undue

consumption of time, or confusing the issues.  (*Balcom*, *supra*, 7 Cal.4th at p. 427.)  That

is, the jury was not diverted to a determination whether or not Solis had committed the

1997 offense because that fact had already been established by his conviction in 2000.

(*Ibid.*)[13]

On balance, we conclude the trial court did not abuse its discretion in finding that

the probative value of evidence regarding the 1997 murder was not substantially

outweighed by its prejudicial effect.

---

[12]     "For example, if a witness to the uncharged offense provided a detailed report of
that incident without being aware of the circumstances of the charged offense, the risk
that the witness's account may have been influenced by knowledge of the charged offense
would be eliminated and the probative value of the evidence would be enhanced.  The
probative value of such evidence would increase further if independent evidence of
additional instances of similar misconduct, committed pursuant to the same design or
plan, were produced."  (*Ewoldt*, *supra*, 7 Cal.4th at pp. 404-05.)  It is unlikely any
witnesses in the trial for the 1997 murder were influenced by the similarities between that
case and Santos's murder because Solis's involvement in Santo's murder was not
suspected until detectives identified Solis in 2012.

[13]     The risk of prejudice could have been even further reduced if the jury had been
aware that Solis was serving a life sentence for the 1997 murder because the jury would
not have been tempted to convict Solis of Santos's murder, regardless of his guilt, to
assure that Solis would be adequately punished for the 1997 murder.  (*Balcom*, *supra*, 7
Cal.4th at p. 427.)

*C.*     *Prejudice to Abad*

Abad contends he was prejudiced by the trial court's erroneous exclusion under Evidence Code section 352 of the facts that the person that Solis stabbed and robbed in 1997 died and that Solis was convicted of murder in that case. We agree, and reverse his conviction on that basis.

"The application of Evidence Code section 352 is not limited to a conflict between opposing sides but may also apply to parties on the same side of litigation when they have adverse positions relative to the introduction of evidence. [Citation.] The rule is the same whether the party objecting to introduction of evidence is the prosecution or a codefendant." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 351 (*Greenberger*).) "However, in a joint criminal trial, if admission of evidence of significant probative value to one defendant would be substantially prejudicial to a codefendant the remedy is not exclusion of the evidence but rather a limiting instruction or severance." (*Id*. at pp. 351-352, citing *Reeder*, *supra*, 82 Cal.App.3d at p. 553.) This is because "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense." (*Reeder*, *supra*, 82 Cal.App.3d at p. 553; accord, *People v. Babbitt* (1988) 45 Cal.3d 660, 684.) This does not "imply, however, that a defendant has a constitutional right to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352." (*Reeder*, *supra*, 82 Cal.App.3d at p. 553.) We review the trial court's ruling for an abuse of discretion. (*Greenberger*, *supra*, 58 Cal.App.4th at p. 352.)

36

Abad relies heavily on *Reeder, supra*, 82 Cal.App.3d 543. There, defendant Reeder was convicted of selling drugs with codefendant Contreras. (*Id*. at p. 547.) Reeder's defense was that he "disliked Contreras to an extent that [Reeder] would *not* have engaged in narcotic dealings with Contreras." (*Id*. at p. 550.) In support, Reeder sought to introduce evidence that Contreras refused to repay a debt owed to Reeder, caused Reeder's step-daughter to contract tuberculosis and attempted to introduce her to the use of heroin, and caused Reeder's nephew to use heroin to the extent he suffered a near-fatal overdose. (*Id*. at pp. 549-550.) The trial court excluded this evidence, but the Court of Appeal reversed.

The *Reeder* court ruled that Reeder should have been allowed to introduce the evidence, but Contreras should have been able to request a limiting instruction or severance:

> "[W]hen defendant proffered evidence in his defense that created a risk of prejudice to codefendant Contreras, it was error for the court to continue the joint trial and exclude defendant's proffered evidence—thus denying to defendant his right to have admitted, in his behalf, evidence of significant probative value to support his defense of innocence. Even though such evidence presented a danger of prejudice to codefendant Contreras by the jury's possible misuse of such evidence, this is not a ground for excluding such evidence. Such a situation is contemplated by Evidence Code section 355 which provides: 'When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly.'

> " . . . It was the codefendant Contreras who was endangered by defendant's proffered evidence and who was entitled to the protection offered by Evidence Code section 355 of requesting an instruction limiting the use of defendant's evidence to its relevant admissible purpose. It was up to codefendant Contreras to move for

37

a mistrial and a separate trial if he felt the danger of prejudice to him could not be alleviated or eliminated by a limiting instruction—that the jury would misuse the evidence and determine that Contreras had a bad character or a propensity for narcotic violations which would lead to the inference that he committed the offenses charged against him."

(*Reeder*, *supra*, 82 Cal.App.3d at p. 555.)

We find *Reeder* persuasive. Abad sought to introduce evidence with significant probative value—that Solis stabbed someone *to death*. Solis's own testimony establishes that he views the outcome of a stabbing to be material. With regard to Santos's murder, Solis testified he did not flee from Abad (whom Solis claimed to barely know) immediately after Abad stabbed Santos because he wasn't sure Santos was dead: "Well, it's like this, had I seen somebody get their head chopped off, then I know they're dead, but I didn't know that this guy died, so no. I just didn't panic and, you know, I got to get away from this guy because he just killed somebody because I didn't know that that person was dead." Solis also testified he did not feel the need to call for help for Santos after he was stabbed because "just because somebody is stabbed doesn't necessarily mean that they're going to die"—a point Solis punctuated by stating, "I've been stabbed before and I didn't die." In ruling on the admissibility of the 1997 murder, the trial court also noted the materiality of the different outcomes of a stabbing: "You can ask the questions, you just can't say what the outcome is. Just because a person gets stabbed doesn't mean necessarily that they die. Lots of people have those kinds of wounds, okay?" Yet, even though the trial court recognized the "paramount" importance of this evidence to Abad's defense, the court excluded it. This was error. Instead, it was incumbent upon *Solis* to

38

request a limiting instruction or to move for severance. (*Reeder*, *supra*, 82 Cal.App.3d at pp. 551-352.)[14]

The People cite *People v Homick* (2012) 55 Cal.4th 816 and *Greenberger*, *supra*, 58 Cal.App.4th 298 as examples of cases where evidence was properly excluded. Those cases are distinguishable because—as the People acknowledge in their briefing—the excluded defense evidence had limited probative value. (*People v Homick*, *supra*, 55 Cal.4th at pp. 865 [characterizing the probative value of the excluded evidence as "marginal" and "slim"]; *Greenberger*, *supra*, 58 Cal.App.4th at p. 352 [characterizing the probative value of the excluded evidence as "not significant to [defendant]'s defense"].)

The trial court's erroneous attempt to sanitize the 1997 murder to protect Solis prejudiced Abad under either *Chapman*, *supra*, 386 U.S. 18 or *People v. Watson* (1956) 46 Cal.2d 818, 836 (different result must have been "reasonably probable" in the absence of the error). In denying defendants' motions for acquittal under section 1181.1, the trial court characterized Solis's motion as an "easy one" and Abad's as a "more difficult one" because, in contrast to the "significant physical evidencing placing [Solis] at the scene," "[t]here's less physical evidence to substantiate [Abad's] participation in this murder, clearly a homicide, and in the Court's mind clearly a robbery." The limited physical evidence substantiating Abad's involvement amplified the significance of Solis's testimony implicating him. Similarly, it amplified Abad's need to implicate Solis as the

---

14  Because it was *Solis's* burden to request severance, we are unpersuaded by the People's argument that *Abad* forfeited the severance issue by failing to renew his severance motion in the trial court.

actual killer by introducing evidence that he had acted according to a common design or plan in 1997. Therefore, the trial court's limitation on Abad's ability to do so prejudiced Abad. Accordingly, we reverse Abad's conviction and set aside the true finding on the robbery-murder special circumstance.

III.

<em>SUBSTANTIAL EVIDENCE</em>

Solis contends insufficient evidence establishes that he committed or attempted to commit a robbery. Thus, he contends his murder conviction—to the extent it is based on a felony-murder theory and not a malice-murder theory (the verdict form does not specify)—and the true finding on the robbery-murder special circumstance are unsupported. He also contends insufficient evidence establishes he was either the perpetrator or aider and abettor in Santos's murder. Consequently, he argues, the trial court also erred by denying his motion for acquittal at the close of the People's case in chief. We construe Abad's joinder as asserting these contentions as to his own guilt.

Although we reverse each of defendants' convictions for the reasons explained above, we nonetheless address the sufficiency of the evidence to support their convictions because the double jeopardy clause precludes retrial if the evidence is insufficient. (*People v. Grant* (2003) 113 Cal.App.4th 579, 584.) As we will explain, we conclude the murder convictions and special circumstance true findings are supported by substantial evidence.

When a defendant challenges the sufficiency of the evidence, " '[t]he court must review the whole record in the light most favorable to the judgment below to determine

40

whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Davis* (1995) 10 Cal.4th 463, 509, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161, fn. 19 (*Letner*) [we apply the same standard of review in assessing the sufficiency of the evidence supporting special circumstance findings].) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.) We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Davis*, *supra*, at p. 509, quoting *People v. Clark* (2011) 52 Cal.4th 856, 942-943.)

A.    *Robbery*

"Robbery is the taking of 'personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 464.)  "Whether an act is performed with any particular specific intent is a question of fact for the trier-of-fact, and where there is any substantial evidence to support the trier's finding on such issue, the finding will not be disturbed on appeal." (*People v. Kranhouse* (1968) 265 Cal.App.2d 440, 449.)

Regarding Santos's car, defendants argue primarily there is insufficient evidence to establish that they intended to permanently deprive him of it.  Rather, they assert the

41

"purpose for taking the car was manifestly to get back to Santa Maria or Lompoc." We are not persuaded.

*Letner*, *supra*, 50 Cal.4th 99 is instructive. Neither of the defendants in that case owned a car. (*Id*. at p. 116.) When a police officer performed a traffic stop on the defendants while they were driving the murder victim's car (before the officer knew of the murder), one defendant told the officer they borrowed it to drive the other defendant home. (*Id*. at p. 118.) The officer conducted sobriety tests on the driver, concluded the driver was not in a condition to drive, and told the defendants to lock the car and continue on foot. (*Id*. at p. 119.) The defendants abandoned the car and walked home. (*Ibid*.) They were later convicted of (among other things) murder and robbery, and were sentenced to death. (*Id*. at p. 114.) On direct appeal to the Supreme Court, the defendants challenged the sufficiency of the evidence supporting the robbery conviction. The Supreme Court concluded, "The jury reasonably could find that defendants were in possession of Pontbriant's car, shortly after she was violently murdered. Based upon this evidence—by itself—the jury reasonably could infer that defendants removed Pontbriant's car against her will by killing her, thus committing a robbery and an intentional murder while engaged in a robbery." (*Id*. at p. 166.) The possibility that the defendants decided to take the victim's car only after they killed her did not render the evidence insufficient. (*Ibid*.)

Similarly, defendants were in possession of Santos's car shortly after he was violently murdered. Thus, the jury reasonably could infer—from this fact alone—that defendants robbed Santos. Defendants' argument that they took the car only to get back

42

to Santa Maria or Lompoc fails for several reasons. First, it is similar to the defendants' unsuccessful claim in *Letner* that they only borrowed the car to drive one of the defendants home. (*Letner*, *supra*, 50 Cal.4th at p. 118.) Second, the fact that defendants may have needed the car to satisfy their immediate transportation needs does not negate the possibility that they intended to deprive Santos (or his heirs) of it permanently.[15] As with the intervening traffic stop in *Letner*, there is no indication defendants would have abandoned Santos's car but for it breaking down on the freeway.

Defendants cite *People v. Butler* (1967) 65 Cal.2d 569, 573 (*Butler*) for the proposition that "[a]lthough an intent to steal may *ordinarily* be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery." (Italics added.) However, *Butler* arose in a context far less analogous than *Letner*—the *Butler* "defendant's only defense to robbery-murder was the existence of an honest belief that he was entitled to the money" he took because the victim owed it to him. (*Id*. at p. 574.)[16]

---

[15] On this point, defendants cite *People v. Moon* (2005) 37 Cal.4th 1, 27 for the proposition that "the Supreme Court recognized that the issue was defendant's intent to keep the car, not his intent to return it to a particular person." However, *Moon* also cites the defendant's killing of the car's owner as *one indicia* of his intent to keep the car permanently. (*Ibid*.)

[16] Butler has since been overruled to the extent it "extended the claim-of-right defense to robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated—as opposed to forcible takings intended to recover specific personal property in which the defendant in good faith believes he has a bona fide claim of ownership or title." (*People v. Tufunga* (1999) 21 Cal.4th 935, 956.)

In any event, substantial evidence beyond defendants' mere possession of Santos's car further supports the finding that defendants robbed or attempted to rob Santos. Physical evidence tied defendants to the crime scene; Abad initially denied knowing Solis, meeting Santos, or hitching a ride with Santos, yet Abad appeared nervous when detectives showed him pictures of Solis and Santos, and Abad's fingerprints were on Santos's car; Solis claimed defendants planned to travel north*west* to Santa Maria and Lompoc, yet they diverted north*east* toward Las Vegas via Victorville; Solis claimed he urgently exited the freeway as Santos attacked him, yet Santos's body, drag marks, and signs of a scuffle were located two miles down a remote frontage road from which no other roads and the freeway were visible; Solis claimed not to have been drinking Coke, yet his fingerprints were found on a Coke can in Santos' car, supporting the prosecutor's theory that Solis drank soft drinks to stay sober while Santos drank alcohol until he passed out, making Santos an easier target; and Solis denied ever going to the KOA campground, but campground assistant manager Nancy Abbott testified she saw Santos at the campground with two men matching defendants' descriptions. Taken together, this circumstantial evidence constitutes substantial evidence that defendants intended to rob Santos of his car.

Regarding Santos's wallet, defendants argue that because it was found at the campground approximately two miles from Santos's body, it likely fell out of his pocket when the three men were buying drinks and was never the object of a robbery. Again, we are unpersuaded. First, Solis does not attempt to reconcile this theory with his claim that he was never at the campground. Second, even if Santos did lose his wallet at the

campground, defendants may have been unaware of that fact and still attempted to rob him of it later.[17] The jury could reasonably infer that defendants learned Santos had a wallet when they stopped at the liquor store and again when they bought drinks at the KOA campground. Santos losing his wallet at the campground would provide a reasonable explanation for why Santos's pants and underwear were removed: defendants were searching for the wallet they had seen earlier but could not find in Santos's pockets.

Third, assuming Santos did not lose his wallet, the jury could reasonably infer defendants robbed Santos of the wallet at the murder scene and discarded the wallet at the campground while fleeing. (*People v. Clark* (2011) 52 Cal.4th 856, 945 [evidence that murder victim had money in her pocket before murder, but not after, "sufficed to raise a strong inference that at some point after defendant's initial use of force against [victim], he took money from her pocket"]; *People v. Hubler* (1951) 102 Cal.App.2d 689, 691-692, 695-696 [the jury reasonably could infer that the defendant took the victim's purse based on evidence that the victim was in possession of a purse and wallet when she was assaulted by defendant and rendered unconscious and that, when she regained consciousness, her purse was missing].) As for why the wallet was found at the campground, tire tracks near the murder scene indicated that a vehicle made a U-turn and traveled southbound on Stoddard Wells Road—toward the KOA campground near the Interstate 15 interchange.

---

[17] Attempted robbery would also support a felony-murder conviction and robbery-murder special circumstance. (§§ 189, 190.2, subd. (a)(17).)

In sum, we conclude substantial evidence supports inferences that defendants robbed Santos of his car and his wallet sufficient to support defendants' convictions for felony-murder and the true findings on the robbery-murder special circumstance.  We would reach this conclusion even without considering evidence introduced after the close of the People's case in chief—namely Solis's trial testimony.  Accordingly, the trial court did not err by denying defendants' motions for acquittal.  (§ 1118.1; *People v. Hajek* (2014) 58 Cal.4th 1144, 1182 ["In determining whether the evidence was sufficient either to sustain a conviction or to support the denial of a section 1118.1 motion, the standard of review is essentially the same."].)

B.    *Murder*

Substantial evidence supports Abad's murder conviction.  He denied knowing Solis or meeting Santos, but when confronted with their photographs, Abad appeared nervous.  Abad denied hitching a ride with Santos or otherwise being in his car, yet Abad's fingerprints were found on the car in an orientation consistent with him sitting inside of it.  The campground assistant manager testified she saw someone matching defendants' description near the time and location of the crime.  The jury could reasonably have inferred Abad was dishonest with the police to conceal his involvement in the crime.  (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1102 ["It is well established that pretrial false statements by a defendant may be admitted to support an inference of consciousness of guilt by the defendant."].)  Abad's apparent dishonesty and fingerprints placing him at the crime scene were sufficient to withstand a motion for

acquittal at the close of the People's case in chief. Solis's defense testimony implicating Abad as the perpetrator further supports Abad's conviction.

Substantial evidence also supports Solis's murder conviction. The People's case-in-chief established Solis's fingerprints and blood were in Santos's car. Solis's blood was also on Santos's clothing. Detective Lenihan testified he has seen several occasions when a suspect using a knife cut himself with it, which would explain why Solis was bleeding even if Santos never hit him with a wine bottle.[18] The campground assistant manager's testimony put Solis near the remote crime scene. This evidence was sufficient to withstand Solis's motion for acquittal.

Solis's defense testimony further supports his murder conviction. Solis testified he and Abad were leaving the group home to travel northwest to Santa Maria and Lompoc, yet they drove northeast with Santos toward his destination of Las Vegas. Solis testified he urgently exited the freeway when Santos hit him with a wine bottle, yet the crime scene was two miles from the freeway on an isolated stretch of road leading to a dumpsite. Solis testified he did not go to the KOA campground, but the assistant manager's testimony contradicted him. Solis testified he did not drink Coke while driving Santos's car, but his fingerprints were on a Coke can on the driver's side. The

---

[18] These facts distinguish this case from those Solis cites for the proposition that determining which of two suspects is the perpetrator is a essentially a " 'coin flip' situation." These facts also distinguish this case from *People v. Russell* (1953) 118 Cal.App.2d 136, 138, where there was insufficient evidence to establish whether the victim had been struck by the defendant or simply fell while intoxicated.

jury could easily have disbelieved Solis's version of events and concluded he was the perpetrator.

Because we conclude substantial evidence supports defendants' convictions and the true finding on the robbery-murder special circumstance, double jeopardy does not bar defendants' retrial.

IV.

*INSTRUCTIONAL ERROR REGARDING UNANIMITY*

Solis contends the trial court erred by not instructing the jury sua sponte that it had to agree unanimously on the two potential objects of the robbery: Santos's car or his wallet. Abad joins in this contention. Because we reverse defendants' convictions, we need not address the merits of this contention. However, because the People may elect to retry defendants, we briefly discuss this contention to provide the trial court with guidance in the event of a retrial.

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679 (*Jennings*).) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) However, "[t]here . . . is no need for a unanimity instruction if the defendant offers the

48

same defense or defenses to the various acts constituting the charged crime." (*Jennings*, *supra*, 50 Cal.4th at p. 679.)  Absent a request by counsel, the trial court must instruct on the unanimity requirement sua sponte when the circumstances warrant it.  (*People v. Davis* (2005) 36 Cal.4th 510, 561 (*Davis*).)

On the record before us, we cannot say the trial court erred by failing to instruct sua sponte on unanimity.  Although the prosecutor did identify Santos's car and wallet as separate objects of the robbery,[19] it appears defendants' defenses did not distinguish between the two objects.  Abad's defense to all claims was that he parted ways with Santos and Solis in Los Angeles County and Solis alone murdered Santos.  Solis's defense was that Abad killed Santos and any intent Solis formed in taking Santos's property he formed after Santos was already dead.  Thus, there appeared to be no need to instruct the jury on unanimity.

On appeal, however, defendants identify separate defenses to each object that they did not raise at trial.  As discussed above, defendants argue as to the car that they had no intent to permanently deprive Santos (or his heirs) of it, whereas they argue the wallet simply fell out of Santos's pocket and was not stolen at all.  In this regard, they assert their case is analogous to *Davis*, *supra*, 36 Cal.4th 510, in which the California Supreme Court held it was prejudicial error not to instruct on unanimity when the defendant asserted separate defenses as to each object of a robbery.  We agree.

---

19     For example, the prosecutor argued during summation:  "To prove a robbery, the defendant took property that was not his own.  In this case, they took his car, and they took his wallet . . . ."  He also argued, "This is an actual robbery.  They took his car. They were successful at taking his car.  They were successful at taking his wallet."

In *Davis*, the defendant and his accomplices drove from South Central Los Angeles to Westwood with the intent to steal a car that they would use to drive to Barstow to rob a liquor store there. (*Davis*, *supra*, 36 Cal.4th at p. 518.) They commandeered a Honda occupied by students Brian Harris and Michelle Boyd. (*Id*. at pp. 517-518.) Defendant and his accomplices drove to an isolated location, where defendant took Harris and Boyd into a field and shot them each once in the head. (*Ibid*.) Defendant and his accomplices drove to Barstow, but did not end up robbing the liquor store because there were too many people there. (*Id*. at p 519.) One of the accomplices abandoned the Honda and set fire to it in an alley in South Central Los Angeles. (*Id*. at p. 520.) The defendant and his accomplices divvied up two rings that resembled rings Boyd always wore but which were not on her body after her murder. (*Ibid*.) The defendant was convicted of (among other things) murder and robbery, and the jury found true a robbery-murder special circumstance; he was sentenced to death. (*Id*. at p. 517.)

On appeal, the defendant argued the trial court erred by failing to instruct on unanimity regarding the robbery of Boyd. (*Davis*, *supra*, 36 Cal.4th at p. 560.) The Supreme Court agreed: "The evidence disclosed two distinct takings: the taking of Harris's car from Boyd and Harris, and the taking of Boyd's rings from her person. Moreover, the prosecutor argued that the jury could rely on either theory to convict defendant of the robbery of Boyd." (*Id*. at p. 561.) The defendant asserted different defenses as to each object: "as to the car, the defense was that Boyd was not legally in possession of it; as to the rings, the defense was that its taking constituted only the lesser included crime of theft." (*Id*. at p. 562.) Under the circumstances, the Supreme Court

50

found the error prejudicial because the court could not determine "from the record whether some jurors found defendant guilty of robbery based on the taking of the rings while others relied solely on defendant's taking of the Honda.  On the facts of this case, some jurors may have had a reasonable doubt as to whether Boyd was still alive when the intent to take her rings was formed while other jurors may have had a doubt about whether Boyd was in possession of Harris's car."  (*Id.* at p. 561.)

Similarly, if defendants are retried, and if they assert separate defenses as to the robbery of Santos's car and wallet—such as those raised in this appeal—the trial court should instruct the jury on the requirement of unanimity.

DISPOSITION

The judgment is reversed.


O'ROURKE, J.

WE CONCUR:


HALLER, Acting P. J.


IRION, J.